# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. ___GV23006510-00___
(CLERK'S OFFICE USE ONLY)

_____Hampton_____ Circuit Court

Hampton Roads III Owner, LLC _____ v./In re: _____ Science Systems and Applications, Inc.
PLAINTIFF(S)                                                      DEFENDANT(S)

I, the undersigned [x] plaintiff [ ] defendant [ ] attorney for [ ] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Counterclaim
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court

**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[x] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment

**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[x] Landlord/Tenant
    [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights

**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[ ] Other General Tort Liability

## ADMINISTRATIVE LAW

[ ] Appeal/Judicial Review of Decision of (select one)
    [ ] ABC Board
    [ ] Board of Zoning
    [ ] Compensation Board
    [ ] DMV License Suspension
    [ ] Employee Grievance Decision
    [ ] Employment Commission
    [ ] Local Government
    [ ] Marine Resources Commission
    [ ] School Board
    [ ] Voter Registration
    [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

[ ] Adoption
    [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
    [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
    [ ] Complaint – Contested*
    [ ] Complaint – Uncontested*
    [ ] Counterclaim/Responsive Pleading
    [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
    [ ] Separate Maintenance Counterclaim

## WRITS

[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
    [ ] Guardian/Conservator
    [ ] Standby Guardian/Conservator
    [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
    [ ] Impress/Declare/Create
    [ ] Reformation
[ ] Will (select one)
    [ ] Construe
    [ ] Contested

## MISCELLANEOUS

[ ] Amend Birth/Death Certificate
[ ] Appointment (select one)
    [ ] Church Trustee
    [ ] Conservator of Peace
    [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
    [ ] Reinstatement pursuant to § 46.2-427
    [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
    [ ] Correct Erroneous State/Local
    [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

[x] Damages in the amount of $ _1,838,459.62_ are claimed.

_8/8/2023_
DATE

_____[signature]_____
[ ] PLAINTIFF  [ ] DEFENDANT  [ ] ATTORNEY FOR  [x] PLAINTIFF [ ] DEFENDANT

Scott A. Krystiniak
PRINT NAME

200 Bendix Road Ste 300
ADDRESS/TELEPHONE NUMBER OF SIGNATOR
Virginia Beach, VA 23452

korte@wolriv.com    757-497-6633
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE 02/23

> *"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

**VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF HAMPTON**

**HAMPTON ROADS III OWNER, LLC**

      **Plaintiff,**

**v.**                                   **CASE NO.: GV23006510**

**SCIENCE SYSTEMS AND APPLICATIONS, INC.**

                 **Serve:**      National Registered Agents, Inc., Registered Agent
                                Science Systems and Applications, Inc.
                                4701 Cox Road, Suite 285
                                Glen Allen, VA 23060

      **Defendant.**

## COMPLAINT

COMES NOW the Plaintiff, HAMPTON ROADS III OWNER, LLC (the "**Plaintiff**"), by counsel, and submits this Complaint in the above-captioned matter against Defendant SCIENCE SYSTEMS AND APPLICATIONS, INC. ("**Defendant**"). As for and in support of said Complaint, the Plaintiff hereby states as follows as follows:

### PRELIMINARY STATEMENT

1.      This matter is in the nature of a breach of contract action due to the Defendant's breach of a certain Deed of Lease (as amended).

### THE PARTIES | JURISDICTION | VENUE

2.      Plaintiff is a limited liability company organized and existing under the laws of the Commonwealth of Virginia for purposes of conducting business in the commercial real estate industry.

3.      Defendant is a Maryland stock corporation registered as a foreign stock corporation in Virginia (Entity ID: 61689035).

4.     This Court has jurisdiction over this matter and the above-captioned parties pursuant to, *inter alia*, Virginia Code §§ 8.01—328.1; 8.01—301; & 17.1-513 and venue is proper in this Court pursuant to Virginia Code §§ 8.01—262(1) & (4).

## FACTS COMMON TO ALL COUNTS

5.     By virtue of a certain Deed of Lease dated October 30, 2006 and several amendments thereto (collectively, the "**Lease**"), the Plaintiff agreed—*inter alia*—to serve as the "Landlord" in leasing certain commercial property located at One Enterprise Parkway in the city of Hampton, Virginia 23666 (the "**Property**") to the Defendant, and, in exchange, the Defendant agreed—*inter alia*—to serve as the "Tenant" in leasing the property under certain specific terms regarding payment and compensation payable to the Plaintiff.

6.     The Lease has been amended a total of five times and a true and accurate copy of the Lease, as amended, is attached hereto as **EXHIBITS A**, **B**, **C**, **D**, **E**, & **F** (collectively, the "**Lease**").

7.     Pursuant to the Lease, the original Term was ultimately amended as part of the Fifth Amendment to Deed of Lease dated January 8, 2021; more specifically, the Lease was set to renew for an additional 60 months, subject to certain other provisions on exactly *when* the "Fifth Amendment Term" was set to begin.

8.     This Fifth Amendment to Deed of Lease arose in large part due to the Defendant's candidacy for an award by the National Aeronautics and Space Administration ("**NASA**") of a competitive follow-on contract to the current "STARSS III" contract in which the Defendant would provide certain additional Science, Technology, and Research Support Services for NASA's nearby Langley Research Center (the "**Follow-On STARSS Contract**").

9.     Practically speaking, Plaintiff and Defendant had generally agreed that the Defendant would be entitled to pay a lesser amount in total Rent in the event it was awarded the

Follow-On STARSS Contract, as both Plaintiff and Defendant would be assured that the "Fifth Amendment Term" would commence and both Plaintiff and Defendant could benefit from a renewed 60-month Lease term; whereas, Plaintiff would be entitled to receive a greater amount in total Rent until such time as things remained uncertain.

10.     Around the time of the Fifth Amendment to the Deed of Lease, the Defendant was confident that it would secure the Follow-On STARSS Contract and indicated to the Plaintiff that it would do so before December of 2021, or at least sometime shortly thereafter.

11.     In fact, the Lease had previously been extended in a similar manner when the Defendant was the recipient of the original "STARSS" contract in 2016.

12.     As such, in December of 2021, the Plaintiff and Defendant began leasing the Property in accordance with the Fifth Amendment to Deed of Lease as if/in anticipation of the Defendant being awarded the Follow-On STARSS Contract.

13.     For example, the Defendant began paying its Monthly Installments for Rent in December of 2021 in amounts of only $25,706.00, which was the monthly amount that would have become due and owed at the beginning of the "Fifth Amendment Term" assuming the Defendant had actually been awarded the Follow-On STARSS Contract; otherwise, the Defendant's monthly rent would have been $29,567.00--a rate consistent with the Monthly Installments under the Short-Term Extension and the Monthly Rent applicable to the immediately prior Lease Year.

14.     Both the Plaintiff and the Defendant continued for well-over a year, as the Defendant eventually began paying its Monthly Installments for Rent in the amounts of only $26,477.23, which was the amount that would have become due and owed during Months 13 through 24 of the "Fifth Amendment Term" again assuming the Defendant had actually been awarded the Follow-On STARSS Contract.

15.     On or about April 30, 2023, however, the Defendant sought to inform the Plaintiff that it intended to unilaterally terminate the Lease in thirty days because NASA had notified the Defendant that it was "no longer being considered" for the Follow-On STARSS Contract: a copy of this correspondence from the Defendant is attached hereto as **EXHIBIT G**.

16.     Pretextually, the Defendant was relying upon Section 3(ii) of the Fifth Amendment to Deed of Lease, which provides in pertinent part as follows:

> 3.      Follow-On STARSS Contract. If, on or prior to November 30, 2021, NASA awards the Follow-On STARSS Contract to Tenant, then the Fifth Amendment Term shall commence and expire as set forth in Section 2 above; otherwise, Tenant shall continue to lease and occupy the Premises at the Monthly Rent applicable to the immediately prior Lease Year, and otherwise pursuant to the terms and conditions of the Lease until the earliest of: (i) the date that NASA awards the Follow-On STARSS Contract to Tenant, in which event the Fifth Amendment Term shall commence on the date that is the Follow-On STARSS Contract commencement date and shall expire on the last day of the sixtieth (60th) full calendar month thereafter, or (ii) the date that NASA awards the Follow-On STARSS Contract to an entity other than Tenant or notifies Tenant that Tenant is no longer being considered for the Follow-On STARSS Contract, in which event Landlord or Tenant shall have the right to terminate this Lease effective thirty (30) days following the delivery of written notice to the other (but in no event shall such termination be effective earlier than November 30, 2021) or (iii) May 31, 2022, after which date Landlord may terminate this Lease upon written notice to Tenant if the Fifth Amendment Term has not yet commenced. Promptly following Tenant's learning of the name, RFP number and/or any other relevant identifying information for the Follow-On STARSS Contract, but in no event later than the awarding of the Follow-On STARSS Contract to Tenant, Tenant shall notify Landlord of such identifying information and the parties shall execute an addendum to this Amendment confirming such identifying information.

17.     The Defendant has since *abandoned* the Property as well, but only well-after the date the Defendant had indicated and only after also causing considerable damage to the Property well-beyond normal wear and tear, which the Plaintiff has had to repair and remediate in advance of any effort to re-let the Premises: such damages are estimated to be no less than $68,049.91 and include the safe removal of sensitive IT wiring systems and equipment; the reconfiguration of doors, locks, and cypher locks; the repairment of walls; the removal of signage; the removal and disposal of furniture and debris; and the cleaning of the leased space.

18.   In fact, the Defendant only ceded physical possession of the Property on June 30, 2023 and even failed to disarm the digital access security system it had used for its exclusive possession of the Property, which resulted in the Plaintiff being denied access to the Property upon the Defendant's departure.

19.   The Defendants' pretextual attempts to terminate the Lease and its failure to pay the appropriate and total amounts due and owed for rent constitute breaches of contract and instances of default under the Lease.

20.   By letter from counsel, the Plaintiff notified Defendant of its breach of contract and default under the Lease and the Defendant failed to cure its default in any manner, let alone within the allotted five days provided to the Defendant under the Lease.

21.   As a direct and proximate result and consequence of the Defendants' breach of the Lease, the Plaintiff has suffered *significant* damages.

<u>COUNT I</u>

- BREACH OF CONTRACT FOR WRONGFUL TERMINATION OF THE LEASE -

22.   The allegations in the foregoing Paragraphs 1 through 21 of this Complaint are hereby incorporated under this Count I as if fully set forth hereunder, with this Count I plead in the alternative to all other Counts plead herein.

23.   The Defendant's unilateral and pretextual attempt to terminate the Lease despite *several years* remaining under the Fifth Amendment Term under the Lease constitutes a clear and unequivocal breach of the Lease.

24.   In fact, the Defendant did not have the right to terminate the Lease in this manner at any point after December of 2021: the time when both Plaintiff and Defendant had deemed the Fifth Amendment Term to have commenced and the Defendant began paying the lesser amount of rent.

25.    *Even if* the Defendant had continued to pay rent at a rate consistent with the Monthly Installments under the Short-Term Extension and the Monthly Rent applicable to the immediately prior Lease Year, the Defendant *still* would not have had the right to terminate the Lease in the manner, as Section 3 only contemplated such termination to occur upon the "earliest" of *either* "the date that NASA awards the Follow-On STARSS Contract to an entity other than Tenant or notifies Tenant that Tenant is no longer being considered for the Follow-On STARSS Contract" *or* "May 31, 2022, after which date Landlord May terminate this Lease upon written notice to Tenant if the Fifth Amendment Term has not yet commenced."

26.    Notably, the Defendant also committed a hold-over of the Property beyond that which it had communicated in its April 30, 2023 correspondence, which further renders its attempted termination invalid.

27.    Finally, upon abandonment of the Property, the Defendant also caused undue damage to the Property well-beyond normal wear and tear, which the Plaintiff has had to repair and remediate in advance of any effort to re-let the Premises: such damages are estimated to be no less than $68,049.91.

28.    But for the Defendant having breach the Lease, the term would have continued until November of 2026 and the Defendant would have remained responsible for all amounts due and owed under the Lease for such span and, per the Lease [Section 22], the Plaintiff's remedies include the acceleration of Rent for the balance of the Term and the collection of attorney's fees and costs in the event that the Plaintiff is the prevailing party.

29.    Accordingly, as a direct and proximate result of the Defendant's breach of contract, the Plaintiff has suffered damages in the total amount of $1,888,459.62 and continues to suffer the burden of attorney's fees and costs related to the commencement and advancement of legal action against the Defendant.

**WHEREFORE**, Plaintiff HAMPTON ROADS III OWNER, LLC requests this Court grant judgment against Defendant SCIENCE SYSTEMS AND APPLICATIONS, INC. in the principal amount of $1,888,459.62 for damages of accelerated rent, with interest accruing thereon at the rate of 6% from the date of judgment and award Plaintiff its reasonable attorney's fees and costs incurred in this matter.  Plaintiff hereby further prays for any and all such other and further relief as the Court deems just or necessary at law and/or in equity.

<u>COUNT II</u>
- BREACH OF CONTRACT FOR FAILURE TO PAY TOTAL AMOUNTS DUE & OWED -

30.      The allegations in the foregoing Paragraphs 1 through 21 of this Complaint are hereby incorporated under this Count II as if fully set forth hereunder, with this Count II plead in the alternative to all other Counts plead herein.

31.      In total, the Defendant has paid Rent in an amount of only $493,812.61 for the period of time from December of 2021 through June of 2023.

32.      The Defendant had paid this total in lesser Monthly Installment amounts (only $25,706.00 and $26,477.23), as if the Fifth Amendment Term had commenced and the Defendant had been awarded the Follow-On STARSS Contract.

33.      In that same timeframe between December of 2021 and June of 2023, and in the event that the Fifth Amendment Term had never truly commenced with the Defendant never having actually been awarded the Follow-On STARSS Contract Lease, the total amount due and owed by the Defendant was $561,773.00, based on the amount of the Monthly Installments under the Short-Term Extension and the Monthly Rent applicable to the immediately prior Lease Year.

34.      The difference between what the Defendant had actually paid for Rent (consistent with the Defendant having actually been awarded the Follow-On STARSS Contract) *versus* what the Defendant would have otherwise been obligated to pay in rent based on the terms of the Lease

and the amount of the Monthly Installments under the Short-Term Extension and the Monthly Rent applicable to the immediately prior Lease Year is $67,960.39.

35. To boot, the Defendant committed a hold-over of the Property even beyond even that which it had specified in its April 30, 2023 correspondence and the Defendant only subsequently abandoned the property on June 30, 2023; as such, the Plaintiff is lawfully entitled to an additional month of full Rent, which for July of 2023 would have equated to payment to the Plaintiff in the amount of $46,067 ($29,567.00 as the Defendant's Monthly Installment / Short-Term Extension Rate and $16,500 in CAM expenses).

36. Despite due notice and demand, the Defendant has refused to pay even this lesser amount, predicated on the assumption—but not the concession—that the Defendant was lawfully able to terminate the Lease in the manner sought.

37. The failure to pay such balance constitutes a clear and unequivocal breach of the Lease.

38. Further, upon abandonment of the Property, the Defendant also caused undue damage to the Property well-beyond normal wear and tear, which the Plaintiff has had to repair and remediate in advance of any effort to re-let the Premises: such damages are estimated to be no less than $68,049.91.

39. But for the Defendant having breach the Lease in this manner, the Plaintiff would have received the total amount due and owed for the period of time from December of 2021 through June of 2023, as determined by the amount of the Monthly Installments under the Short-Term Extension and the Monthly Rent applicable to the immediately prior Lease Year.

40. Per the Lease [Section 22], the Plaintiff's remedies include the recovery of all or any part of any Rent due and owed, plus any attorney's fees and costs in the event that the Plaintiff is the prevailing party.

41.    Accordingly, as a direct and proximate result of the Defendant's breach of contract, the Plaintiff has suffered damages in the total amount of no less than $182,077.30 and continues to suffer the burden of attorney's fees and costs related to the commencement and advancement of legal action against the Defendant.

**WHEREFORE**, Plaintiff HAMPTON ROADS III OWNER, LLC requests this Court grant judgment against Defendant SCIENCE SYSTEMS AND APPLICATIONS, INC. in the principal amount of $182,077.30 for damages of accelerated rent, with interest accruing thereon at the rate of 6% from the date of judgment and award Plaintiff its reasonable attorney's fees and costs incurred in this matter.  Plaintiff hereby further prays for any and all such other and further relief as the Court deems just or necessary at law and/or in equity.

HAMPTON ROADS III OWNER, LLC

By: _____
Of Counsel

Kyle D. Korte, Esq. (VSB# 71162)
Scott A. Krystiniak, Esq. (VSB #90852)
WOLCOTT RIVERS GATES
200 Bendix Road, Suite 300
Virginia Beach, VA 23452
Phone: (747) 497-6633
Facsimile: (757) 687-3655
korte@wolriv.com
skrystiniak@wolriv.com
*Counsel for Plaintiff*

# DEED OF LEASE

## LIBERTY PROPERTY LIMITED PARTNERSHIP
### Landlord

## AND

## SCIENCE SYSTEMS AND APPLICATIONS, INC.
### Tenant

## AT

### Oxford Plaza
### One Enterprise Parkway
### Hampton, Virginia 23666

# DEED OF LEASE

INDEX

§      Section                                                                                                   Page

Table of Contents

Page

1.  Basic Lease Terms and Definitions. .......................................................................1
2.  Premises.......................................................................................................................2
3.  Use...............................................................................................................................2
4.  Term; Possession.......................................................................................................2
5.  Rent.............................................................................................................................2
6.  Operating Expenses...................................................................................................2
7.  Services.......................................................................................................................2
8.  Insurance; Waivers; Indemnification.....................................................................3
9.  Maintenance and Repairs.........................................................................................3
10. Compliance.................................................................................................................4
11. Signs............................................................................................................................4
12. Alterations..................................................................................................................4
13. Mechanics' Liens.......................................................................................................5
14. Landlord's Right to Relocate Tenant; Right of Entry...........................................5
15. Damage by Fire or Other Casualty..........................................................................5
16. Condemnation............................................................................................................5
17. Quiet Enjoyment........................................................................................................6
18. Assignment and Subletting.......................................................................................6
19. Subordination; Mortgagee's Rights.........................................................................6
20. Tenant's Certificate; Financial Information............................................................7
21. Surrender....................................................................................................................7
22. Defaults - Remedies..................................................................................................7
23. Tenant's Authority.....................................................................................................8
24. Liability of Landlord.................................................................................................8
25. Miscellaneous............................................................................................................9
26. Notices........................................................................................................................9
27. Security Deposit.........................................................................................................9
28. Tenant Improvements................................................................................................9
29. Option to Extend Term.............................................................................................9
30. Additional Space.......................................................................................................9
31. Option to Terminate.................................................................................................10
32. Supplemental Parking.............................................................................................10
33. Parking.....................................................................................................................10
34. Commission..............................................................................................................10

THIS DEED OF LEASE ("Lease") is made by and between L. RTY PROPERTY LIMITED PARTNERSHIP, a Pennsylvania limited partnership ("Landlord") and SCIENCE SYSTEMS AND APPLICATIONS, INC., a corporation organized under the laws of Maryland ("Tenant"), and is dated as of the date on which this Lease has been fully executed by Landlord and Tenant.

1.      **Basic Lease Terms and Definitions.**

**Premises:** Suite 160 and Suite 200, as shown on **Exhibit "A"**, consisting of 21,848 rentable square feet.

**Building:** 64,357 rentable square feet.
            Address:  One Enterprise Parkway, Hampton, Virginia 23666

**Term:**  Fifty-Nine (59) months (plus any partial month from the Commencement Date until the first day of the next full calendar month during the Term).

**Commencement Date:**  December 1, 2006, or the date Tenant takes possession of the Premises, if earlier

**Expiration Date:**  October 31, 2011 (subject to extension as set forth in Sections 4 and 29 below)

**Minimum Annual Rent:**  Payable in monthly installments as follows:

| Lease Year | Annual | Monthly | Lease Year | Annual | Monthly |
|---|---|---|---|---|---|
| 1 | $240,328.00 | $20,027.33 | 4 | $262,612.89 | $21,884.41 |
| 2 | $247,537.84 | $20,628.15 | 5 | $270,491.28 | $22,540.94 |
| 3 | $254,963.97 | $21,247.00 | | | |

**Annual Operating Expenses:**  $152,936.00, payable in monthly installments of $12,744.67, subject to adjustment as provided in this Lease.

**Tenant's Share:** 33.95% (also see Definitions)

**Use:**  General office.

**Security Deposit:**  $32,772.00

**Addresses For Notices:**

Landlord:    Liberty Property Limited Partnership    Tenant:    Before the Commencement Date:
            208 Golden Oak Court, Suite 220                        10210 Greenbelt Road
            Virginia Beach, VA  23452                              Suite 600
            Attention: Vice President/City Manager                 Lanham, MD 20706

                                                        On or after the Commencement Date:  Premises

**Guarantor:**  None.

**Additional Defined Terms:**  See Rider 1 for the definitions of other capitalized terms.

**Contents:**  The following are attached to and made a part of this Lease:
            Rider 1 – Additional Definitions        Exhibits:    "A" – Plan Showing Premises
                                                                "B" – Building Rules
                                                                "C" – Estoppel Certificate Form
                                                                "D" – Cleaning Schedule
                                                                "E" – Preliminary Plan
                                                                "F" – Additional Space
                                                                "G" – Plans and Specifications

2.   **Premises.**  Landlord leases to Tenant and Tenant leases from Landlord the Premises, together with the right in common with others to use the Common Areas.  Tenant accepts the Premises, Building and Common Areas "AS IS", without relying on any representation, covenant or warranty by Landlord other than as expressly set forth in this Lease.  Landlord and Tenant (a) acknowledge that all square foot measurements are approximate and (b) stipulate and agree to the rentable square footages set forth in Sections 1(a) and (b) above for all purposes with respect to this Lease (such square footages also being shown on the Preliminary Plan attached to this Lease as Exhibit "E".

3.   **Use.**  Tenant shall occupy and use the Premises only for the Use specified in Section 1 above.  Tenant shall not permit any conduct or condition which may endanger, disturb or otherwise interfere with any other Building occupant's normal operations or with the management of the Building.  Tenant may use all Common Areas only for their intended purposes. Landlord shall have exclusive control of all Common Areas at all times.

4.   **Term; Possession.**  The Term of this Lease shall commence on the Commencement Date and shall end on the Expiration Date, unless sooner terminated in accordance with this Lease.  If Landlord is delayed in delivering possession of all or any portion of the Premises to Tenant as of the Commencement Date, Tenant will take possession on the date Landlord delivers possession, which date will then become the Commencement Date (and, if such delay in delivery of possession is caused by any act or omission of Tenant, the Expiration Date will be extended so that the length of the Term remains unaffected by such delay). Landlord shall not be liable for any loss or damage to Tenant resulting from any delay in delivering possession due to the holdover of any existing tenant or other circumstances outside of Landlord's reasonable control.

5.   **Rent.**  Tenant agrees to pay to Landlord, without demand, deduction or offset, Minimum Annual Rent and Annual Operating Expenses for the Term.  Tenant shall pay the Monthly Rent, in advance, on the first day of each calendar month during the Term, at Landlord's address designated in Section 1 above unless Landlord designates otherwise; provided that Monthly Rent for the first full month shall be paid at the signing of this Lease.  If the Commencement Date is not the first day of the month, the Monthly Rent for that partial month shall be apportioned on a per diem basis and shall be paid on or before the Commencement Date.  Tenant shall pay Landlord a service and handling charge equal to 5% of any Rent not paid within 5 days after the date due. In addition, any Rent, including such charge, not paid within 5 days after the due date will bear interest at the Interest Rate from the date due to the date paid.  If any taxes, special assessments, fees or other charges are imposed against Landlord by any authority with respect to the Rent, Tenant will pay these amounts to Landlord when due.

6.   **Operating Expenses.**  The amount of the Annual Operating Expenses set forth in Section 1(g) above represents Tenant's Share of the estimated Operating Expenses for the calendar year in which the Term commences.  Landlord may adjust such amount from time to time if the estimated Annual Operating Expenses increase or decrease; Landlord may also invoice Tenant separately from time to time for Tenant's Share of any extraordinary or unanticipated Operating Expenses.  By April 30th of each year (and as soon as practical after the expiration or termination of this Lease or, at Landlord's option, after a sale of the Property), Landlord shall provide Tenant with a statement of Operating Expenses for the preceding calendar year or part thereof. Within 30 days after delivery of the statement to Tenant, Landlord or Tenant shall pay to the other the amount of any overpayment or deficiency then due from one to the other or, at Landlord's option, Landlord may credit Tenant's account for any overpayment.  If Tenant does not give Landlord notice within 30 days after receiving Landlord's statement that Tenant disagrees with the statement and specifying the items and amounts in dispute, Tenant shall be deemed to have waived the right to contest the statement.  Landlord's and Tenant's obligation to pay any overpayment or deficiency due the other pursuant to this Section shall survive the expiration or termination of this Lease.  Notwithstanding any other provision of this Lease to the contrary, Landlord may, in its reasonable discretion, determine from time to time the method of computing and allocating Operating Expenses, including the method of allocating Operating Expenses to various types of space within the Building to reflect any disparate levels of services provided to different types of space.  If the Building is not fully occupied during any period, Landlord may make a reasonable adjustment based on occupancy in computing the Operating Expenses for such period so that Operating Expenses are computed as though the Building had been fully occupied.

7.   **Services.**  Landlord will furnish the following services for the normal use and occupancy of the Premises for general office purposes:  (i) electricity, (ii) heating and air conditioning in season in sufficient quantities as are standard for comparable buildings in Landlord's reasonable opinion to support Tenant's Use during Normal Business Hours, (iii) water, (iv) trash removal and janitorial services pursuant to the cleaning schedule attached as **Exhibit "D"** and (v) such other services Landlord reasonably determines are appropriate or necessary.  If Tenant requests, and if Landlord is able to furnish, services in addition to those identified above, including heating or air conditioning outside of Normal Business Hours, Tenant shall pay Landlord's reasonable charge for such supplemental services.  If because of Tenant's density, equipment or other Tenant circumstances, Tenant puts demands on the Building Systems in excess of those of the typical office user in the Building, Landlord may install supplemental equipment and meters at Tenant's expense.  Landlord shall not be responsible or liable for any interruption in such services, nor shall such interruption affect the continuation or validity of this Lease; provided, however, in the event that such services shall be suspended or interrupted due to the negligence or willful misconduct of Landlord, and such suspension or interruption thereby prevents Tenant from (and Tenant, in fact, ceases) conducting all or a material portion of its business operations in the Premises

and such suspension or interruption has not resulted from a failure of Tenant to perform any of its obligations under the Lease, and if such suspension or interruption and the resulting untenantability continues for a period of three (3) consecutive days after Tenant gives Landlord written notice of such interruption or suspension, then Tenant's rental obligations shall thereafter be proportionally abated until such services are fully restored.  Landlord shall have the exclusive right to select, and to change, the companies providing such services to the Building or Premises.  Any wiring, cabling or other equipment necessary to connect Tenant's telecommunications equipment shall be Tenant's responsibility, and shall be installed in a manner approved by Landlord.   In the event Tenant's consumption of any utility or other service included in Operating Expenses is excessive in Landlord's reasonable opinion, Landlord may invoice Tenant separately for, and Tenant shall pay on demand, the cost of Tenant's excessive consumption, as reasonably determined by Landlord.

**8.**     **Insurance; Waivers; Indemnification.**

    **(a)**     Landlord shall maintain insurance against loss or damage to the Building or the Property with coverage for perils as set forth under the "Causes of Loss-Special Form" or equivalent property insurance policy in an amount equal to the full insurable replacement cost of the Building (excluding coverage of Tenant's personal property and any Alterations by Tenant), and such other insurance, including rent loss coverage, as Landlord may reasonably deem appropriate or as any Mortgagee may require.

    **(b)**     Tenant, at its expense, shall keep in effect commercial general liability insurance, including blanket contractual liability insurance, covering Tenant's use of the Property, with such coverages and limits of liability as Landlord may reasonably require, but not less than a $1,000,000 combined single limit with a $2,000,000 general aggregate limit (which general aggregate limit may be satisfied by an umbrella liability policy) for bodily injury or property damage; however, such limits shall not limit Tenant's liability hereunder.  The policy shall name Landlord, Liberty Property Trust and any other associated or affiliated entity as their interests may appear and at Landlord's request, any Mortgagee(s), as additional insureds, shall be written on an "occurrence" basis and not on a "claims made" basis and shall be endorsed to provide that it is primary to and not contributory to any policies carried by Landlord and to provide that it shall not be cancelable or reduced without at least 30 days prior notice to Landlord.  The insurer shall be authorized to issue such insurance, licensed to do business and admitted in the state in which the Property is located and rated at least A VII in the most current edition of *Best's Insurance Reports*.  Tenant shall deliver to Landlord on or before the Commencement Date or any earlier date on which Tenant accesses the Premises, and at least 30 days prior to the date of each policy renewal, a certificate of insurance evidencing such coverage.

    **(c)**     Landlord and Tenant each waive, and release each other from and against, all claims for recovery against the other for any loss or damage to the property of such party arising out of fire or other casualty coverable by a standard "Causes of Loss-Special Form" property insurance policy with, in the case of Tenant, such endorsements and additional coverages as are considered good business practice in Tenant's business, even if such loss or damage shall be brought about by the fault or negligence of the other party or its Agents; provided, however, such waiver by Landlord shall not be effective with respect to Tenant's liability described in Sections 9(b) and 10(d) below.  This waiver and release is effective regardless of whether the releasing party actually maintains the insurance described above in this subsection and is not limited to the amount of insurance actually carried, or to the actual proceeds received after a loss.  Each party shall have its insurance company that issues its property coverage waive any rights of subrogation, and shall have the insurance company include an endorsement acknowledging this waiver, if necessary.  Tenant assumes all risk of damage of Tenant's property within the Property, including any loss or damage caused by water leakage, fire, windstorm, explosion, theft, act of any other tenant, or other cause.

    **(d)**     Subject to subsection (c) above, and except to the extent caused by the negligence or willful misconduct of Landlord or its Agents, Tenant will indemnify, defend, and hold harmless Landlord and its Agents from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) which may be asserted against, imposed upon, or incurred by Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Property by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the Term.  Tenant's obligations pursuant to this subsection shall survive the expiration or termination of this Lease.

    **(e)**     Subject to subsection (c) above, and except to the extent caused by the negligence or willful misconduct of Tenant or its Agents, Landlord will indemnify, defend, and hold harmless Tenant and its Agents from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) which may be asserted against, imposed upon or incurred by Tenant or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about Common Areas or occasioned wholly or in part by any negligence or willful misconduct of Landlord or its Agents, whether prior to, during, or after the Term.  Landlord's obligations pursuant to this subsection shall survive the expiration or termination of this Lease.

**9.**     **Maintenance and Repairs.**

(a)      Landlord shall Maintain the Building, including the Premises, the Common Areas, the Building Systems and any other improvements owned by Landlord located on the Property in a professional manner befitting a comparable first-class office building in Hampton, Virginia.  If Tenant becomes aware of any condition that is Landlord's responsibility to repair, Tenant shall promptly notify Landlord of the condition.

(b)      Tenant at its sole expense shall keep the Premises in a neat and orderly condition.  Alterations, repairs and replacements to the Property, including the Premises, made necessary because of Tenant's Alterations or installations, any use or circumstances special or particular to Tenant, or any act or omission of Tenant or its Agents shall be made at the sole expense of Tenant to the extent not covered by any applicable insurance proceeds paid to Landlord.

10.      **Compliance**.

(a)      Tenant will, at its expense, promptly comply with all Laws now or subsequently pertaining to the Premises or Tenant's use or occupancy.  Tenant will pay any taxes or other charges by any authority on Tenant's property or trade fixtures or relating to Tenant's use of the Premises.  Neither Tenant nor its Agents shall use the Premises in any manner that under any Law would require Landlord to make any Alteration to or in the Building or Common Areas (without limiting the foregoing, Tenant shall not use the Premises in any manner that would cause the Premises or the Property to be deemed a "place of public accommodation" under the ADA if such use would require any such Alteration).  From and after the Commencement Date, Tenant shall be responsible for compliance with the ADA, and any other Laws regarding accessibility, with respect to the Premises.

(b)      Tenant will comply, and will cause its Agents to comply, with the Building Rules.

(c)      Tenant agrees not to do anything or fail to do anything which will increase the cost of Landlord's insurance or which will prevent Landlord from procuring policies (including public liability) from companies and in a form satisfactory to Landlord.  If any breach of the preceding sentence by Tenant causes the rate of fire or other insurance to be increased, Tenant shall pay the amount of such increase as additional Rent within 30 days after being billed.

(d)      Tenant agrees that (i) no activity will be conducted on the Premises that will use or produce any Hazardous Materials, except for activities which are part of the ordinary course of Tenant's business and are conducted in accordance with all Environmental Laws ("Permitted Activities"); (ii) the Premises will not be used for storage of any Hazardous Materials, except for materials used in the Permitted Activities which are properly stored in a manner and location complying with all Environmental Laws; (iii) no portion of the Premises or Property will be used by Tenant or Tenant's Agents for disposal of Hazardous Materials; (iv) Tenant will deliver to Landlord copies of all Material Safety Data Sheets and other written information prepared by manufacturers, importers or suppliers of any chemical; and (v) Tenant will immediately notify Landlord of any violation by Tenant or Tenant's Agents of any Environmental Laws or the release or suspected release of Hazardous Materials in, under or about the Premises, and Tenant shall immediately deliver to Landlord a copy of any notice, filing or permit sent or received by Tenant with respect to the foregoing.  If at any time during or after the Term, any portion of the Property is found to be contaminated by Tenant or Tenant's Agents or subject to conditions prohibited in this Lease caused by Tenant or Tenant's Agents, Tenant will indemnify, defend and hold Landlord harmless from all claims, demands, actions, liabilities, costs, expenses, attorneys' fees, damages and obligations of any nature arising from or as a result thereof, and Landlord shall have the right to direct remediation activities, all of which shall be performed at Tenant's cost.  Tenant's obligations pursuant to this subsection shall survive the expiration or termination of this Lease.

11.      **Signs**.  Landlord will furnish Tenant building standard identification signage on the interior Building directory, if applicable, and on or beside the main entrance door to the Premises.  In addition, subject to applicable governmental regulations, Landlord shall install a tenant directory sign (on which Tenant shall have a panel) near the entrance of the Building, the size and location of such sign (and Tenant's panel) to be determined by Landlord in its sole discretion. Tenant shall not place any signs on the Property without the prior consent of Landlord, other than signs that are located wholly within the interior of the Premises and not visible from the exterior of the Premises.  Tenant shall maintain all signs installed by Tenant in good condition. Tenant shall remove its signs at the termination of this Lease, shall repair any resulting damage, and shall restore the Property to its condition existing prior to the installation of Tenant's signs.

12.      **Alterations**. Except for non-structural Alterations that (i) do not exceed $5,000 in the aggregate, (ii) are not visible from the exterior of the Premises, (iii) do not affect any Building System or the structural strength of the Building, (iv) do not require penetrations into the floor, ceiling or walls, and (v) do not require work within the walls, below the floor or above the ceiling, Tenant shall not make or permit any Alterations in or to the Premises without first obtaining Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.  With respect to any Alterations made by or on behalf of Tenant (whether or not the Alteration requires Landlord's consent): (i) not less than 10 days prior to commencing any Alteration, Tenant shall deliver to Landlord the plans, specifications and necessary permits for the Alteration, together with certificates evidencing

that Tenant's contractors and subcontractors have adequate insurance coverage naming Landlord, Liberty Property Trust and any other associated or affiliated entity as their interests may appear as additional insureds, (ii) Tenant shall obtain Landlord's prior written approval of any contractor or subcontractor (which consent shall not be unreasonably withheld, conditioned or delayed provided that such contractor or subcontractor for whom Tenant is requesting approval from Landlord (A) will not be performing any work to the Building systems and (B) is licensed to do work in the Commonwealth of Virginia, is fully insured, and is qualified (in Landlord's reasonable opinion) to perform the work for which such contractor or subcontractor is being hired, (iii) the Alteration shall be constructed with new materials, in a good and workmanlike manner, and in compliance with all Laws and the plans and specifications delivered to, and, if required above, approved by Landlord, (iv) Tenant shall pay Landlord all reasonable costs and expenses in connection with Landlord's review of Tenant's plans and specifications, and of any supervision or inspection of the construction Landlord deems necessary, and (v) upon Landlord's request Tenant shall, prior to commencing any Alteration, provide Landlord reasonable security against liens arising out of such construction.  Any Alteration by Tenant shall be the property of Tenant until the expiration or termination of this Lease; at that time without payment by Landlord the Alteration shall remain on the Property and become the property of Landlord unless Landlord gives notice to Tenant to remove it, in which event Tenant will remove it, will repair any resulting damage and will restore the Premises to the condition existing prior to Tenant's Alteration.  At Tenant's request prior to Tenant making any Alterations, Landlord will notify Tenant whether Tenant is required to remove the Alterations at the expiration or termination of this Lease.  Tenant may install its trade fixtures, furniture and equipment in the Premises, provided that the installation and removal of them will not affect any structural portion of the Property, any Building System or any other equipment or facilities serving the Building or any occupant.

**13.**   **Mechanics' Liens**.   Tenant promptly shall pay for any labor, services, materials, supplies or equipment furnished to Tenant in or about the Premises.  Tenant shall keep the Premises and the Property free from any liens arising out of any labor, services, materials, supplies or equipment furnished or alleged to have been furnished to Tenant.  Tenant shall take all steps permitted by law in order to avoid the imposition of any such lien.  Should any such lien or notice of such lien be filed against the Premises or the Property, Tenant shall discharge the same by bonding or otherwise within 15 days after Tenant has notice that the lien or claim is filed regardless of the validity of such lien or claim.

**14.**   **Landlord's Right to Relocate Tenant; Right of Entry**.

>   **(a)**   Intentionally omitted.

>   **(b)**   Tenant shall permit Landlord and its Agents to enter the Premises at all reasonable times following reasonable notice (except in an emergency) and accompanied by a representative of Tenant (except in an emergency) to inspect, Maintain, or make Alterations to the Premises or Property, to exhibit the Premises for the purpose of sale or financing, and, during the last 12 months of the Term, to exhibit the Premises to any prospective tenant.  Landlord will make reasonable efforts not to inconvenience Tenant in exercising such rights, but Landlord shall not be liable for any interference with Tenant's occupancy resulting from Landlord's entry.

**15.**   **Damage by Fire or Other Casualty**.   If the Premises or Common Areas shall be damaged or destroyed by fire or other casualty, Tenant shall promptly notify Landlord, and Landlord, subject to the conditions set forth in this Section, shall repair such damage and restore the Premises or Common Areas to substantially the same condition in which they were immediately prior to such damage or destruction, but not including the repair, restoration or replacement of the fixtures, equipment, or Alterations installed by or on behalf of Tenant.  Landlord shall notify Tenant, within 30 days after the date of the casualty, if Landlord anticipates that the restoration will take more than 180 days from the date of the casualty to complete; in such event, either Landlord or Tenant (unless the damage was caused by Tenant) may terminate this Lease effective as of the date of casualty by giving notice to the other within 10 days after Landlord's notice.  If a casualty occurs during the last 12 months of the Term, Landlord may terminate this Lease unless Tenant has the right to extend the Term for at least 3 more years and does so within 30 days after the date of the casualty.  Moreover, Landlord may terminate this Lease if the loss is not covered by the insurance required to be maintained by Landlord under this Lease.  Tenant will receive an abatement of Minimum Annual Rent and Annual Operating Expenses to the extent the Premises are rendered untenantable as a result of the casualty.

**16.**   **Condemnation**.   If (a) all of the Premises are Taken, (b) any part of the Premises is Taken and the remainder is insufficient in Landlord's opinion for the reasonable operation of Tenant's business, or (c) any of the Property is Taken, and, in Landlord's opinion, it would be impractical or the condemnation proceeds are insufficient to restore the remainder, then this Lease shall terminate as of the date the condemning authority takes possession.  If this Lease is not terminated, Landlord shall restore the Building to a condition as near as reasonably possible to the condition prior to the Taking, the Minimum Annual Rent shall be abated for the period of time all or a part of the Premises is untenantable in proportion to the square foot area untenantable, and this Lease shall be amended appropriately.  The compensation awarded for a Taking shall belong to Landlord.  Except for any relocation benefits to which Tenant may be entitled, Tenant hereby assigns all claims against the condemning authority to Landlord, including, but not limited to, any claim relating to Tenant's leasehold estate.

17. **Quiet Enjoyment**. Landlord covenants that Tenant, upon performing all of its covenants, agreements and conditions of this Lease, shall have quiet and peaceful possession of the Premises as against anyone claiming by or through Landlord, subject, however, to the terms of this Lease.

18. **Assignment and Subletting**.

(a) Except as provided in Section (b) below, Tenant shall not enter into nor permit any Transfer voluntarily or by operation of law, without the prior consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Without limitation, Tenant agrees that Landlord's consent shall not be considered unreasonably withheld if (i) the proposed transferee is an existing tenant of Landlord, (ii) the business, business reputation, or creditworthiness of the proposed transferee is unacceptable to Landlord, (iii) Landlord has comparable space available for lease by the proposed transferee in a building in Landlord's portfolio of buildings in Hampton, Virginia, or (iv) Tenant is in default under this Lease or any act or omission has occurred which would constitute a default with the giving of notice and/or the passage of time. A consent to one Transfer shall not be deemed to be a consent to any subsequent Transfer. In no event shall any Transfer relieve Tenant from any obligation under this Lease. Landlord's acceptance of Rent from any person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any Transfer. Any Transfer not in conformity with this Section 18 shall be void at the option of Landlord.

(b) Landlord's consent shall not be required in the event of any Transfer by Tenant to an Affiliate provided that (i) the Affiliate has a tangible net worth at least equal to that of Tenant as of the date of this Lease, (ii) Tenant provides Landlord notice of the Transfer at least ten (10) business days prior to the effective date, together with current financial statements of the Affiliate certified by an executive officer of the Affiliate, and (iii) in the case of an assignment or sublease, Tenant delivers to Landlord an assumption agreement reasonably acceptable to Landlord executed by Tenant and the Affiliate, together with a certificate of insurance evidencing the Affiliate's compliance with the insurance requirements of Tenant under this Lease.

(c) The provisions of subsection (a) above notwithstanding, if Tenant proposes to Transfer all of the Premises (other than to an Affiliate), Landlord may terminate this Lease, either conditioned on execution of a new lease between Landlord and the proposed transferee or without that condition. If Tenant proposes to enter into a Transfer of less than all of the Premises (other than to an Affiliate), Landlord may amend this Lease to remove the portion of the Premises to be transferred, either conditioned on execution of a new lease between Landlord and the proposed transferee or without that condition. If this Lease is not so terminated or amended, Tenant shall pay to Landlord, immediately upon receipt, the excess of (i) all compensation received by Tenant for the Transfer over (ii) the Rent allocable to the Premises transferred.

(d) If Tenant requests Landlord's consent to a Transfer, Tenant shall provide Landlord, at least ten (10) business days prior to the proposed Transfer, current financial statements of the transferee certified by an executive officer of the transferee, a complete copy of the proposed Transfer documents, and any other information Landlord reasonably requests. Immediately following any approved assignment or sublease, Tenant shall deliver to Landlord an assumption agreement reasonably acceptable to Landlord executed by Tenant and the transferee, together with a certificate of insurance evidencing the transferee's compliance with the insurance requirements of Tenant under this Lease. Tenant agrees to reimburse Landlord for reasonable administrative and attorneys' fees in connection with the processing and documentation of any Transfer for which Landlord's consent is requested; provided, however, that Tenant shall not be responsible for reimbursing Landlord for an amount greater than $500 for any specific request (such $500 not to be a cumulative cap) in which the proposed transferee accepts (without any negotiation or request for change) the conditions set forth by Landlord for such Transfer. Landlord agrees to respond to Tenant's request for a Transfer within ten (10) business days after receipt from Tenant of all information requested by Landlord with respect to such Transfer.

19. **Subordination; Mortgagee's Rights**.

(a) Tenant accepts this Lease subject and subordinate to any Mortgage now or in the future affecting the Premises, provided that Tenant's right of possession of the Premises shall not be disturbed by the Mortgagee so long as Tenant is not in default under this Lease. This clause shall be self-operative, but within 10 days after request, Tenant shall execute and deliver any further instruments confirming the subordination of this Lease and any further instruments of attornment that the Mortgagee may reasonably request. However, any Mortgagee may at any time subordinate its Mortgage to this Lease, without Tenant's consent, by giving notice to Tenant, and this Lease shall then be deemed prior to such Mortgage without regard to their respective dates of execution and delivery; provided that such subordination shall not affect any Mortgagee's rights with respect to condemnation awards, casualty insurance proceeds, intervening liens or any right which shall arise between the recording of such Mortgage and the execution of this Lease.

(b) No Mortgage shall be (i) liable for any act or omission of a prior landlord, (ii) subject to any rental offsets or defenses against a prior landlord, (iii) bound by any amendment of this Lease made without its written consent, or (iv) bound by

payment of Monthly Rent more than one month in advance or liable for any other funds paid by Tenant to Landlord unless such funds actually have been transferred to the Mortgagee by Landlord.

(c)  The provisions of Sections 15 and 16 above notwithstanding, Landlord's obligation to restore the Premises after a casualty or condemnation shall be subject to the consent and prior rights of any Mortgagee.

20.  **Tenant's Certificate; Financial Information.**  Within 10 days after Landlord's request from time to time, (a) Tenant shall execute, acknowledge and deliver to Landlord, for the benefit of Landlord, Mortgagee, any prospective Mortgagee, and any prospective purchaser of Landlord's interest in the Property, an estoppel certificate in the form of attached **Exhibit "C"** (or other form requested by Landlord), modified as necessary to accurately state the facts represented, and (b) Tenant shall furnish to Landlord, Landlord's Mortgagee, prospective Mortgagee and/or prospective purchaser reasonably requested financial information.  Notwithstanding the foregoing, Tenant shall not be required to comply with subsections (a) and (b) above more than two (2) times each during any Lease Year.

21.  **Surrender.**

(a)  On the date on which this Lease expires or terminates, Tenant shall return possession of the Premises to Landlord in good condition, except for ordinary wear and tear, and except for casualty damage or other conditions that Tenant is not required to remedy under this Lease.  Prior to the expiration or termination of this Lease, Tenant shall remove from the Property all furniture, trade fixtures, equipment, and all other personal property installed by Tenant or its assignees or subtenants. Tenant shall repair any damage resulting from such removal and shall restore the Property to good order and condition.  Any of Tenant's personal property not removed as required shall be deemed abandoned, and Landlord, at Tenant's expense, may remove, store, sell or otherwise dispose of such property in such manner as Landlord may see fit and/or Landlord may retain such property or sale proceeds as its property.  If Tenant does not return possession of the Premises to Landlord in the condition required under this Lease, Tenant shall pay Landlord all resulting damages Landlord may suffer.

(b)  If Tenant remains in possession of the Premises after the expiration or termination of this Lease, Tenant's occupancy of the Premises shall be that of a tenancy at will.  Tenant's occupancy during any holdover period shall otherwise be subject to the provisions of this Lease (unless clearly inapplicable), except that the Monthly Rent shall be one hundred fifty percent (150%) of the Monthly Rent payable for the last full month immediately preceding the holdover.  No holdover or payment by Tenant after the expiration or termination of this Lease shall operate to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise.  Any provision in this Lease to the contrary notwithstanding, any holdover by Tenant shall constitute a default on the part of Tenant under this Lease entitling Landlord to exercise, without obligation to provide Tenant any notice or cure period, all of the remedies available to Landlord in the event of a Tenant default, and Tenant shall be liable for all damages, including consequential damages, that Landlord suffers as a result of the holdover.

22.  **Defaults - Remedies.**

(a)  It shall be an Event of Default:

(i)  If Tenant does not pay in full when due any and all Rent and, except as provided in Section 22(c) below, Tenant fails to cure such default on or before the date that is 5 days after Landlord gives Tenant written notice of default; provided, however, that Landlord shall only be required to give Tenant written notice of default pursuant to this subsection (a)(i) one (1) time during any Lease Year and, thereafter, it shall be an Event of Default if Tenant does not pay in full when due any and all Rent and, except as provided in Section 22(c) below, Tenant fails to cure such default on or before the date that is 5 days after Landlord gives Tenant notice (which notice does not have to be written) of default;

(ii)  If Tenant enters into or permits any Transfer in violation of Section 18 above;

(iii)  If Tenant fails to observe and perform or otherwise breaches any other provision of this Lease, and, except as provided in Section 22(c) below, Tenant fails to cure the default on or before the date that is 10 days after Landlord gives Tenant notice of default; provided, however, if the default cannot reasonably be cured within 10 days following Landlord's giving of notice, Tenant shall be afforded additional reasonable time (not to exceed 30 days following Landlord's notice) to cure the default if Tenant begins to cure the default within 10 days following Landlord's notice and continues diligently in good faith to completely cure the default; or

(iv)  If Tenant becomes insolvent or makes a general assignment for the benefit of creditors or offers a settlement to creditors, or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal or state law is filed by or against Tenant, or a bill in equity or other proceeding for the appointment of a receiver for any of

Tenant's assets is commenced, or if any of the real or personal property of Tenant shall be levied upon; provided that any proceeding brought by anyone other than Landlord or Tenant under any bankruptcy, insolvency, receivership or similar law shall not constitute an Event of Default until such proceeding has continued unstayed for more than 60 consecutive days.

(b)     If an Event of Default occurs, Landlord shall have the following rights and remedies:

(i)     Landlord, without any obligation to do so, may elect to cure the default on behalf of Tenant, in which event Tenant shall reimburse Landlord upon demand for any sums paid or costs incurred by Landlord (together with an administrative fee of 15% thereof) in curing the default, plus interest at the Interest Rate from the respective dates of Landlord's incurring such costs, which sums and costs together with interest at the Interest Rate shall be deemed additional Rent;

(ii)    To enter and repossess the Premises, by breaking open locked doors if necessary, and remove all persons and all or any property, by action at law or otherwise, without being liable for prosecution or damages. Landlord may, at Landlord's option, make Alterations and repairs in order to relet the Premises and relet all or any part(s) of the Premises for Tenant's account. Tenant agrees to pay to Landlord on demand any deficiency (taking into account all costs incurred by Landlord) that may arise by reason of such reletting. In the event of reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease for such previous breach;

(iii)   To accelerate the whole or any part of the Rent for the balance of the Term, and declare the same to be immediately due and payable; and

(iv)    To terminate this Lease and the Term without any right on the part of Tenant to save the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken.

(c)     Any provision to the contrary in this Section 22 notwithstanding, (i) Landlord shall not be required to give Tenant any notice and opportunity to cure provided in Section 22(a) above more than twice in any consecutive 12-month period (with written notice only being required one (1) time during any Lease Year), and thereafter Landlord may declare an Event of Default without affording Tenant any of the notice and cure rights provided under this Lease, and (ii) Landlord shall not be required to give such notice prior to exercising its rights under Section 22(b) if Tenant fails to comply with the provisions of Sections 13, 20 or 27 or in an emergency.

(d)     No waiver by Landlord of any breach by Tenant shall be a waiver of any subsequent breach, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to such or any subsequent breach. Efforts by Landlord to mitigate the damages caused by Tenant's default shall not constitute a waiver of Landlord's right to recover damages hereunder. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the total amount due Landlord under this Lease shall be deemed to be other than on account, nor shall any endorsement or statement on any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of Rent due, or Landlord's right to pursue any other available remedy.

(e)     If either party commences an action against the other party arising out of or in connection with this Lease, the prevailing party shall be entitled to have and recover from the other party attorneys' fees, costs of suit, investigation expenses and discovery costs, including costs of appeal.

(f)     Landlord and Tenant waive the right to a trial by jury in any action or proceeding based upon or related to, the subject matter of this Lease.

**23.     Tenant's Authority.** Tenant represents and warrants to Landlord that: (a) Tenant is duly formed, validly existing and in good standing under the laws of the state under which Tenant is organized, and qualified to do business in the state in which the Property is located, and (b) the person(s) signing this Lease are duly authorized to execute and deliver this Lease on behalf of Tenant.

**24.     Liability of Landlord.** The word **"Landlord"** in this Lease includes the Landlord executing this Lease as well as its successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this Lease as Landlord. Any such person or entity, whether or not named in this Lease, shall have no liability under this Lease after it ceases to hold title to the Premises except for obligations already accrued (and, as to any unapplied portion of Tenant's Security Deposit, Landlord shall be relieved of all liability upon transfer of such portion to its successor in interest). Tenant shall look solely to Landlord's successor in interest for the performance of the covenants and

obligations of the Landlord hereunder which subsequently accrue. Landlord shall not be deemed to be in default under this Lease unless Tenant gives Landlord notice specifying the default and Landlord fails to cure the default within a reasonable period following Tenant's notice. In no event shall Landlord be liable to Tenant for any loss of business or profits of Tenant or for consequential, punitive or special damages of any kind. Neither Landlord nor any principal of Landlord nor any owner of the Property, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Lease or the Premises; Tenant shall look solely to the equity of Landlord in the Property for the satisfaction of any claim by Tenant against Landlord.

25.   **Miscellaneous**.

   **(a)**   The captions in this Lease are for convenience only, are not a part of this Lease and do not in any way define, limit, describe or amplify the terms of this Lease.

   **(b)**   This Lease represents the entire agreement between the parties hereto and there are no collateral or oral agreements or understandings between Landlord and Tenant with respect to the Premises or the Property. No rights, easements or licenses are acquired in the Property or any land adjacent to the Property by Tenant by implication or otherwise except as expressly set forth in this Lease. This Lease shall not be modified in any manner except by an instrument in writing executed by the parties. The masculine (or neuter) pronoun and the singular number shall include the masculine, feminine and neuter genders and the singular and plural number. The word "including" followed by any specific item(s) is deemed to refer to examples rather than to be words of limitation. The word "person" includes a natural person, a partnership, a corporation, a limited liability company, an association and any other form of business association or entity. Both parties having participated fully and equally in the negotiation and preparation of this Lease, this Lease shall not be more strictly construed, nor any ambiguities in this Lease resolved, against either Landlord or Tenant.

   **(c)**   Each covenant, agreement, obligation, term, condition or other provision contained in this Lease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making the same, not dependent on any other provision of this Lease unless otherwise expressly provided. All of the terms and conditions set forth in this Lease shall apply throughout the Term unless otherwise expressly set forth herein.

   **(d)**   If any provisions of this Lease shall be declared unenforceable in any respect, such unenforceability shall not affect any other provision of this Lease, and each such provision shall be deemed to be modified, if possible, in such a manner as to render it enforceable and to preserve to the extent possible the intent of the parties as set forth herein. This Lease shall be construed and enforced in accordance with the laws of the state in which the Property is located.

   **(e)**   This Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives and permitted successors and assigns. All persons liable for the obligations of Tenant under this Lease shall be jointly and severally liable for such obligations.

   **(f)**   Tenant shall not record this Lease or any memorandum without Landlord's prior consent.

26.   **Notices**.   Any notice, consent or other communication under this Lease shall be in writing and addressed to Landlord or Tenant at their respective addresses specified in Section 1 above (or to such other address as either may designate by notice to the other) with a copy to any Mortgagee or other party designated by Landlord. Each notice or other communication shall be deemed given if sent by prepaid overnight delivery service or by certified mail, return receipt requested, postage prepaid or in any other manner, with delivery in any case evidenced by a receipt, and shall be deemed to have been given on the day of actual delivery to the intended recipient or on the business day delivery is refused. The giving of notice by Landlord's attorneys, representatives and agents under this Section shall be deemed to be the acts of Landlord.

27.   **Security Deposit**.   At the time of signing this Lease, Tenant shall deposit with Landlord the Security Deposit to be retained by Landlord as cash security for the faithful performance and observance by Tenant of the provisions of this Lease. Tenant shall not be entitled to any interest on the Security Deposit. Landlord shall have the right to commingle the Security Deposit with its other funds. Landlord may use the whole or any part of the Security Deposit for the payment of any amount as to which Tenant is in default or to compensate Landlord for any loss or damage it may suffer by reason of Tenant's default under this Lease. If Landlord uses all or any portion of the Security Deposit as herein provided, within 10 days after demand, Tenant shall pay Landlord cash in an amount equal to that portion of the Security Deposit used by Landlord. If Tenant complies fully and faithfully with all of the provisions of this Lease, the Security Deposit shall be returned to Tenant within thirty (30) days after the Expiration Date and surrender of the Premises to Landlord.

28.   **Tenant Improvements**.

MT OFFICE FORM VAB: 090705                    9
F:\Electronic Leases\C Final Execution Version\bfd SCIENCE SYSTEMS & APPLICATIONS, INC (SSAI) - LEASE 10252006 WS I-729263.3.DOC

(a)     **Design of Premises.**  Landlord, at its sole cost and expense, shall contract with the appropriate architects, engineers and/or space design professionals (selected by Landlord) for the space plans and final construction drawings (the "Plans and Specifications") for improvements to be completed to the Premises by Landlord pursuant to subsection (b) below, which Plans and Specifications shall be based on the Preliminary Plan of the Premises jointly developed by Landlord and Tenant dated October 18, 2006, a copy of which is attached hereto as Exhibit "E" and the standard specifications and finishes for the Building. Upon completion, the Plans and Specifications shall be attached to this Lease as Exhibit "G".  Landlord's obligations shall be limited, however, to the preparation of the Plans and Specificaitons, with allowance for one (1) set of revisions.  The cost of any additional revisions to the Plans and Specifications or any other design services not provided for in this subsection (a) shall be the sole cost and expense of Tenant.

(b)     **Improvements.**  Landlord shall construct the Premises in accordance with the Plans and Specifications; provided, however, that Landlord shall not commence such construction until that date (the "Construction Commencement Date") which is two (2) weeks after the date on which Tenant informs Landlord by written notice that Tenant desires to have Landlord commence construction, which written notice cannot be given to Landlord at anytime preceding the Commencement Date. All necessary construction shall be substantially completed and ready for use and occupancy by Tenant by that date which is seventy-five (75) days after the Construction Commencement Date, such date of substantial completion being subject to extension for delays due to any cause beyond the reasonable control of Landlord or Landlord's contractors or suppliers. All construction shall be done in a good and workmanlike manner and shall comply at the time of completion with all applicable laws and requirements of the governmental authorities having jurisdiction.  Landlord agrees to complete such construction at Tenant's sole expense equal to the aggregate of all costs, expenses and fees incurred by or on behalf of Landlord in connection therewith (the "Tenant's Cost"), including without limitation (i) architectural, engineering and design costs, (ii) the cost charged to Landlord by Landlord's general contractor and all subcontractors for performing such construction, and (iii) the cost to Landlord of performing directly any portion of such construction.  Landlord agrees to credit Tenant with an allowance equal to the lesser of the Tenant's Cost or Two Hundred Sixty-Two Thousand One Hundred Seventy-Six and 00/100 Dollars ($262,176.00) (the "Tenant Allowance").  Tenant agrees to pay to Landlord, within thirty (30) days after being billed therefor, the excess (if any) of the Tenant's Cost above the Tenant Allowance.  Notwithstanding the foregoing, Tenant agrees to pay Landlord, within thirty (30) days after receipt of an invoice therefor, for any improvements to the Premises requested by Tenant which are not shown on the Plans and Specifications. Landlord agrees to use commercially reasonable efforts to obtain fair pricing for Landlord's work set forth in this subsection (b).

(c)     **Telephone and Date Communication Lines.**  Notwithstanding the foregoing, Tenant, at its sole cost and expense, shall be responsible for the installation, maintenance and repair of all telephone and data communication systems required by Tenant in the Premises, and Tenant shall coordinate all work related to the installation of such telephone and data communication systems with the Building Manager.

29.     **Option to Extend Term.**  Provided that Landlord has not given Tenant notice of default more than two (2) times preceding the Expiration Date, that there then exists no event of default by Tenant under this Lease nor any event that with the giving of notice and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, Tenant shall have the right and option to extend the Term for one (1) additional period of sixty (60) months, exercisable by giving Landlord at least one hundred eighty (180) days prior written notice in advance of the Expiration Date of Tenant's election to extend the Term; it being agreed that time is of the essence and that this option is personal to Tenant and is non-transferable to any assignee or sublessee (regardless of whether any such assignment or sublease was made with or without Landlord's consent) or other party.  Such extension shall be under the same terms and conditions as provided in this Lease except as follows:

(a)     the additional period, if the option is exercised, shall begin on the date immediately following the Expiration Date and thereafter the Expiration Date shall be deemed to be the last day of the sixtieth (60th) full calendar month thereafter;

(b)     there shall be no further options to extend; and

(c)     the Minimum Annual Rent payable by Tenant during the additional period shall be the fair market value of comparable space in a comparable first-class office building in Hampton, Virginia, leased to tenants with financial stability comparable to that of Tenant, including allowance for market escalations.

30.     **Additional Space.**  If and when any of those certain spaces currently known as Suites 100, 120, 130, 140, 150, 155 and 215 in the Building and being shown as "Additional Space" on Exhibit "F" attached hereto (each space as it become available being referred to herein as the "Additional Space") first become available for rental during the Term of this Lease to a party other than the party currently in occupancy thereof (or a party related thereto) and provided that Landlord has not given Tenant notice of default more than two (2) times preceding the Expiration Date, that there then exists no event of default by Tenant under this Lease nor any event that with the giving of notice and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, Tenant shall have the right of first opportunity to lease each Additional Space, subject to the following:

(a)    Landlord shall notify Tenant when each Additional Space first becomes available for rental by any party other than the tenant then in occupancy of such Additional Space (or a party related thereto) and Tenant shall have ten (10) business days following receipt of such notice within which to notify Landlord in writing that Tenant is interested in negotiating terms for leasing such Additional Space and to have its offer considered by Landlord prior to the leasing by Landlord of such Additional Space to a third party. If Tenant notifies Landlord within such time period that Tenant is so interested, then Landlord and Tenant shall have fifteen (15) days following Landlord's receipt of such notice from Tenant within which to negotiate in good faith on mutually satisfactory terms for the leasing of the applicable Additional Space by Tenant and to execute an amendment to this Lease incorporating such terms or a new lease for such Additional Space.

(b)    If Tenant does not notify Landlord within such ten (10) business days of its interest in leasing the applicable Additional Space or if Tenant does not execute such amendment or lease within such fifteen (15) days, if applicable, then this right of first opportunity to lease such Additional Space will lapse and be of no further force or effect and Landlord shall have the right to lease all or part of such Additional Space to any other party at any time on any terms and conditions acceptable to Landlord.

(c)    This right of first opportunity to lease each Additional Space is subordinate to any right of first opportunity or offer currently held by any other tenant, is a one-time right if and when each Additional Space first becomes available, is personal to Tenant and is non-transferable to any assignee or sublessee (regardless of whether any such assignment or sublease was made with or without Landlord's consent) or other party.

Landlord's approval: _____
                     **Senior Vice President, Regional Director**

31.    **Option to Terminate.** Provided that an Event of Default has not occurred more than two (2) times preceding the Expiration Date, that there then exists no event of default by Tenant under this Lease nor any event that with the giving of notice and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, Tenant shall have the right and option to terminate this Lease at any time during the initial Term of this Lease, exercisable (a) by giving Landlord (i) a minimum of six (6) months prior written notice (the "Termination Notice") thereof, and (ii) written proof satisfactory to Landlord that Tenant's contract with the National Aeronautics and Space Administration entitled "Science Technology and Research Support Services (STARRS)" and numbered NNL07AA00C has been terminated through no fault of Tenant, and (b) by paying Landlord, within sixty (60) days after the Termination Notice, an amount (the "Termination Fee") equal to the sum of (x) three (3) months of Minimum Annual Rent at the then-current rate, (y) three (3) months of Annual Operating Expenses at the then-current rate, and (z) the unamortized balance of all costs associated with this Lease (including, but not limited to, internal leasing fees, brokerage commissions, legal fees and tenant improvements, with such costs to be amortized over the fifty-nine (59) months of the initial Term of this Lease using an assumed interest rate of ten percent (10%) per annum). Tenant shall pay all Rent under the Lease and abide by all of the terms and conditions of this Lease through and including such early termination date. Notwithstanding the foregoing, in the event that Tenant fails to pay the Termination Fee to Landlord within sixty (60) days after the Termination Notice, the Termination Notice shall be deemed null and void and this Lease shall remain in full force and effect unaffected by the Termination Notice. In addition, in the event that Tenant fails to pay the Termination Fee to Landlord within sixty (60) days after the Termination Notice, Tenant's right to terminate pursuant to this Section 31 shall be deemed null and void and Tenant shall no longer have a right to terminate this Lease pursuant to this Section 31.

Landlord's approval: _____
                     **Senior Vice President, Regional Director**

32.    **Supplemental HVAC Costs.** In addition to the payment of Minimum Annual Rent and Annual Operating Expenses under this Lease, Tenant shall also pay to Landlord, as additional rent due on the first (1st) day of every month of the Term, the utility costs (the "Supplemental HVAC Costs") associated with operating the supplemental HVAC systems (the "Supplemental HVAC System") currently serving the Premises. Tenant, at its sole cost and expense, shall also be responsible for the maintenance, repair and replacement of the Supplemental HVAC System.

33.    **Parking.** Tenant shall have the right to use, on a non-exclusive basis, in common with all other tenants in the Building, at no additional cost to Tenant, one hundred twenty (120) parking spaces in the parking area serving the Building.

**34.**     **Commission.**

    **(a)**     Tenant and Landlord represent and warrant to each other that Atlantic Real Estate Group, LLC ("Broker") is the only broker or finder that each has had any dealings, negotiations or consultations with relating to the Premises or this transaction on behalf of Tenant and that no other broker or finder called the Premises to Tenant's attention for lease or took any part in any dealings, negotiations or consultations relating to the Premises or this Lease on Tenant's behalf.

    **(b)**     **(i)**     Landlord shall pay a commission to Broker pursuant to the terms of a separate agreement (the "Commission Agreement") between Landlord and Broker, such commission representing payment in full to Broker for all services rendered in connection with this Lease or any modification, extension or renewal of this Lease or expansion of the Premises. Such commission will be paid up front, upon occupancy of the Premises by Tenant and following Landlord's receipt of the Minimum Annual Rent and Annual Operating Expenses payable to Landlord for the first month of the Term, the Security Deposit and Tenant's certificate of insurance pursuant to Section 8 of the Lease. Broker shall be the sole beneficiary of this Section 34(b), and Tenant shall have no rights or claims against Landlord pursuant hereto.

        **(ii)**     Notwithstanding the foregoing, Broker shall be entitled to a commission pursuant to the terms of the Commission Agreement with respect to any renewal, expansion or extension term under this Lease provided that (A) Tenant gives Landlord prior written notice that it is represented exclusively by Broker at the time of such renewal/extension/expansion, (B) Broker actively participates in the negotiations relating to such renewal/extension/expansion and (C) Tenant is not represented by any other broker or finder in connection with such renewal, expansion or extension. In no event, however, will Landlord be responsible for the payment of more than one (1) commission for the representation of Tenant with respect to any such renewal, expansion or extension.

    **(c)**     Tenant agrees to be responsible for, indemnify, defend and hold harmless Landlord from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Landlord arising from any breach by Tenant of Tenant's foregoing representation and warranty. Landlord agrees to be responsible for, indemnify, defend and hold harmless Tenant from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Tenant arising from any breach by Landlord of Landlord's foregoing representation and warranty.

**34.**     **Contingency.**     Tenant agrees that Landlord's obligations under this Lease are contingent upon Landlord's entering into (a) a reduction in space amendment with the current tenant of Suites 160, 170, 171, 180, 220, 250, 260 and 280 in the Building upon terms and conditions satisfactory to Landlord and (b) a reduction in space amendment with the current tenant of Suite 270 in the Building upon terms and conditions satisfactory to Landlord. If either contingency has not been satisfied on or before November 30, 2006, Landlord or Tenant may terminate this Lease by giving written notice to the other party prior to the date of satisfaction of such contingency, in which event this Lease shall be considered null and void.

    Landlord and Tenant have executed this Lease on the respective date(s) set forth below.

Landlord:

**LIBERTY PROPERTY LIMITED PARTNERSHIP**

By:  Liberty Property Trust, Sole General Partner

Date signed:

10/30/06

    By: _____
        Craig A. Cope
        Vice President and City Manager

Date signed:

_____

Tenant:

**SCIENCE SYSTEMS AND APPLICATIONS, INC.**

Attest:

Name: LINDA AGUIRRE
Title: CONTROLLER

    By: _____
    Name: Anoop N. Mehta
    Title: Vice President, Finance & Administration

MT OFFICE FORM VAB: 090705        12

<u>Rider 1 to Lease Agreement</u>

(Multi-Tenant Office)

**ADDITIONAL DEFINITIONS**

"ADA" means the Americans With Disabilities Act of 1990 (42 U.S.C. § 1201 et seq.), as amended and supplemented from time to time.

"Affiliate" means (i) any entity controlling, controlled by, or under common control of, Tenant, (ii) any successor to Tenant by merger, consolidation or reorganization, and (iii) any purchaser of all or substantially all of the assets of Tenant as a going concern.

"Agents" of a party means such party's employees, agents, representatives, contractors, licensees or invitees.

"Alteration" means any addition, alteration or improvement to the Premises or Property, as the case may be.

"Building Rules" means the rules and regulations attached to this Lease as **Exhibit "B"** as they may be amended from time to time.

"Building Systems" means any electrical, mechanical, structural, plumbing, heating, ventilating, air conditioning, sprinkler, life safety or security systems serving the Building.

"Common Areas" means all areas and facilities as provided by Landlord from time to time for the use or enjoyment of all tenants in the Building or Property, including, if applicable, lobbies, hallways, restrooms, elevators, driveways, sidewalks, parking, loading and landscaped areas.

"Environmental Laws" means all present or future federal, state or local laws, ordinances, rules or regulations (including the rules and regulations of the federal Environmental Protection Agency and comparable state agency) relating to the protection of human health or the environment.

"Event of Default" means a default described in Section 22(a) of this Lease.

"Hazardous Materials" means pollutants, contaminants, toxic or hazardous wastes or other materials the removal of which is required or the use of which is regulated, restricted, or prohibited by any Environmental Law.

"Interest Rate" means interest at the rate of 1 ½% per month.

"Land" means the lot or plot of land on which the Building is situated or the portion thereof allocated by Landlord to the Building.

"Laws" means all laws, ordinances, rules, orders, regulations, guidelines and other requirements of federal, state or local governmental authorities or of any private association or contained in any restrictive covenants or other declarations or agreements, now or subsequently pertaining to the Property or the use and occupation of the Property.

"Lease Year" means the period from the Commencement Date through the succeeding 12 full calendar months (including for the first Lease Year any partial month from the Commencement Date until the first day of the first full calendar month) and each successive 12-month period thereafter during the Term.

"Maintain" means to provide such maintenance, repair and, to the extent necessary and appropriate, replacement, as may be needed to keep the subject property in good condition and repair.

"Monthly Rent" means the monthly installment of Minimum Annual Rent plus the monthly installment of estimated Annual Operating Expenses payable by Tenant under this Lease.

"Mortgage" means any mortgage, deed of trust or other lien or encumbrance on Landlord's interest in the Property or any portion thereof, including without limitation any ground or master lease if Landlord's interest is or becomes a leasehold estate.

"Mortgagee" means the holder of any Mortgage, including any ground or master lessor if Landlord's interest is or becomes a leasehold estate.

"Normal Business Hours" means 8:00 a.m. to 6:00 p.m., Monday through Friday, and 8:00 a.m. to 1:00 p.m., Saturdays, legal holidays excepted.

"Operating Expenses" means all costs, charges and expenses incurred or charged by Landlord in connection with the ownership, operation, maintenance and repair of, and services provided to, the Property, including, but not limited to, (i) the charges at standard retail rates for any services provided by Landlord pursuant to Section 7 of this Lease, (ii) the cost of insurance carried by Landlord pursuant to Section 8 of this Lease together with the cost of any deductible paid by Landlord in connection with an insured loss, (iii) Landlord's cost to Maintain the Property pursuant to Section 9 of this Lease, (iv) the cost of trash collection, (v) all levies, taxes (including real estate taxes, sales taxes and gross receipt taxes), assessments, liens, license and permit fees, together with the reasonable cost of contesting any of the foregoing, which are applicable to the Term, and which are imposed by any authority or under any Law, or pursuant to any recorded covenants or agreements, upon or with respect to the Property, or any improvements thereto, or directly upon this Lease or the Rent or upon amounts payable by any subtenants or other occupants of the Premises, or against Landlord because of Landlord's estate or interest in the Property, (vi) the annual amortization (over their estimated economic useful life or payback period, whichever is shorter) of the costs (including reasonable financing charges) of capital improvements or replacements (a) required by any Laws, (b) made for the purpose of reducing Operating Expenses, or (c) made for the purpose of directly enhancing the safety of tenants in the Building, (vii) a management and administrative fee, and (viii) a tenant service charge. The foregoing notwithstanding, Operating Expenses will not include: (i) depreciation on the Building, (ii) financing and refinancing costs (except as provided above), interest on debt or amortization payments on any mortgage, or rental under any ground or underlying lease, (iii) leasing commissions, advertising expenses, tenant improvements or other costs directly related to the leasing of the Property, or (iv) income, excess profits or corporate capital stock tax imposed or assessed upon Landlord, unless such tax or any similar tax is levied or assessed in lieu of all or any part of any taxes includable in Operating Expenses above. If Landlord elects to prepay real estate taxes during any discount period, Landlord shall be entitled to the benefit of any such prepayment. Landlord shall have the right to directly perform (by itself or through an affiliate) any services provided under this Lease provided that the Landlord's charges included in Operating Expenses for any such services shall not exceed competitive market rates for comparable services.

"Property" means the Land, the Building, the Common Areas, and all appurtenances to them.

"Rent" means the Minimum Annual Rent, Annual Operating Expenses and any other amounts payable by Tenant to Landlord under this Lease.

"Taken" or "Taking" means acquisition by a public authority having the power of eminent domain by condemnation or conveyance in lieu of condemnation.

"Tenant's Share" means the percentage obtained by dividing the rentable square feet of the Premises by the rentable square feet of the Building, as set forth in Section 1 of this Lease.

"Transfer" means (i) any assignment, transfer, pledge or other encumbrance of all or a portion of Tenant's interest in this Lease, (ii) any sublease, license or concession of all or a portion of Tenant's interest in the Premises, or (iii) any transfer of a controlling interest in Tenant.



EXHIBIT A

OXFORD PLAZA HAMPTON ROADS CENTER
HAMPTON, VIRGINIA

SUITE LAYOUT PLAN – FIRST FLOOR

LIBERTY PROPERTY TRUST

OXFORD PLAZA
FIRST FLOOR LAYOUT
SUITES 100, 130, 140, 150 ?, 160, 4, 180

— Premises



EXHIBIT A

SUITE LAYOUT PLAN — SECOND FLOOR

OXFORD PLAZA HAMPTON ROADS CENTER
VIRGINIA BEACH, VIRGINIA

LIBERTY PROPERTY TRUST

OXFORD PLAZA
SECOND FLOOR LAYOUT
SUITES 200, 215, 220, 220A, 250, & 260 ?

## EXHIBIT "B"

## BUILDING RULES

1.       Any sidewalks, lobbies, passages, elevators and stairways shall not be obstructed or used by Tenant for any purpose other than ingress and egress from and to the Premises.  Landlord shall in all cases retain the right to control or prevent access by all persons whose presence, in the judgment of Landlord, shall be prejudicial to the safety, peace or character of the Property.

2.       The toilet rooms, toilets, urinals, sinks, faucets, plumbing or other service apparatus of any kind shall not be used for any purposes other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith or left in any lobbies, passages, elevators or stairways.

3.       Tenant shall not impair in any way the fire safety system and shall comply with all security, safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.  No person shall go on the roof without Landlord's prior written permission.

4.       Skylights, windows, doors and transoms shall not be covered or obstructed by Tenant, and Tenant shall not install any window covering which would affect the exterior appearance of the Building, except as approved in writing by Landlord.  Tenant shall not remove, without Landlord's prior written consent, any shades, blinds or curtains in the Premises.

5.       Without Landlord's prior written consent, Tenant shall not hang, install, mount, suspend or attach anything from or to any sprinkler, plumbing, utility or other lines.  If Tenant hangs, installs, mounts, suspends or attaches anything from or to any doors, windows, walls, floors or ceilings, Tenant shall spackle and sand all holes and repair any damage caused thereby or by the removal thereof at or prior to the expiration or termination of the Lease.

6.       Tenant shall not change any locks nor place additional locks upon any doors.

7.       Tenant shall not use nor keep in the Building any matter having an offensive odor, nor explosive or highly flammable material, nor shall any animals other than handicap assistance dogs in the company of their masters be brought into or kept in or about the Property.

8.       If Tenant desires to introduce electrical, signaling, telegraphic, telephonic, protective alarm or other wires, apparatus or devices, Landlord shall direct where and how the same are to be placed, and except as so directed, no installation boring or cutting shall be permitted.  Landlord shall have the right to prevent and to cut off the transmission of excessive or dangerous current of electricity or annoyances into or through the Building or the Premises and to require the changing of wiring connections or layout at Tenant's expense, to the extent that Landlord may deem necessary, and further to require compliance with such reasonable rules as Landlord may establish relating thereto, and in the event of non-compliance with the requirements or rules, Landlord shall have the right immediately to cut wiring or to do what it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building.  All wires installed by Tenant must be clearly tagged at the distributing boards and junction boxes and elsewhere where required by Landlord, with the number of the office to which said wires lead, and the purpose for which the wires respectively are used, together with the name of the concern, if any, operating same.  No machinery of any kind other than customary small business machines shall be allowed in the Premises.  Tenant shall not use any method of heating, air conditioning or air cooling other than that provided by Landlord.

9.       Tenant shall not place weights anywhere beyond the safe carrying capacity of the Building which is designed to normal office building standards for floor loading capacity.  Landlord shall have the right to exclude from the Building heavy furniture, safes and other articles which may be hazardous or to require them to be located at designated places in the Premises.

10.      The use of rooms as sleeping quarters is strictly prohibited at all times.

11.      Tenant shall have the right, at Tenant's sole risk and responsibility, to use only Tenant's Share of the parking spaces at the Property as reasonably determined by Landlord.  Tenant shall comply with all parking regulations promulgated by Landlord from time to time for the orderly use of the vehicle parking areas, including without limitation the following: Parking shall be limited to automobiles, passenger or equivalent vans, motorcycles, light four wheel pickup trucks

and (in designated areas) bicycles. No vehicles shall be left in the parking lot overnight without Landlord's prior written approval. Parked vehicles shall not be used for vending or any other business or other activity while parked in the parking areas. Vehicles shall be parked only in striped parking spaces, except for loading and unloading, which shall occur solely in zones marked for such purpose, and be so conducted as to not unreasonably interfere with traffic flow within the Property or with loading and unloading areas of other tenants. Employee and tenant vehicles shall not be parked in spaces marked for visitor parking or other specific use. All vehicles entering or parking in the parking areas shall do so at owner's sole risk and Landlord assumes no responsibility for any damage, destruction, vandalism or theft. Tenant shall cooperate with Landlord in any measures implemented by Landlord to control abuse of the parking areas, including without limitation access control programs, tenant and guest vehicle identification programs, and validated parking programs, provided that no such validated parking program shall result in Tenant being charged for spaces to which it has a right to free use under its Lease. Each vehicle owner shall promptly respond to any sounding vehicle alarm or horn, and failure to do so may result in temporary or permanent exclusion of such vehicle from the parking areas. Any vehicle which violates the parking regulations may be cited, towed at the expense of the owner, temporarily or permanently excluded from the parking areas, or subject to other lawful consequence. Bicycles are not permitted in the Building.

12.      Tenant and its Agents shall not smoke in the Building or at the Building entrances and exits.

13.      Tenant shall provide Landlord with a written identification of any vendors engaged by Tenant to perform services for Tenant at the Premises (examples: security guards/monitors, telecommunications installers/maintenance), and all vendors shall be subject to Landlord's reasonable approval. No mechanics shall be allowed to work on the Building or Building Systems other than those engaged by Landlord. Tenant shall permit Landlord's employees and contractors and no one else to clean the Premises unless Landlord consents in writing. Tenant assumes all responsibility for protecting its Premises from theft and vandalism and Tenant shall see each day before leaving the Premises that all lights are turned out and that the windows and the doors are closed and securely locked.

14.      Tenant shall comply with any move-in/move-out rules provided by Landlord and with any rules provided by Landlord governing access to the Building outside of Normal Business Hours. Throughout the Term, no furniture, packages, equipment, supplies or merchandise of Tenant will be received in the Building, or carried up or down in the elevators or stairways, except during such hours as shall be designated by Landlord, and Landlord in all cases shall also have the exclusive right to prescribe the method and manner in which the same shall be brought in or taken out of the Building.

15.      Tenant shall not place oversized cartons, crates or boxes in any area for trash pickup without Landlord's prior approval. Landlord shall be responsible for trash pickup of normal office refuse placed in ordinary office trash receptacles only. Excessive amounts of trash or other out-of-the-ordinary refuse loads will be removed by Landlord upon request at Tenant's expense.

16.      Tenant shall cause all of Tenant's Agents to comply with these Building Rules.

17.      Landlord reserves the right to rescind, suspend or modify any rules or regulations and to make such other rules and regulations as, in Landlord's reasonable judgment, may from time to time be needed for the safety, care, maintenance, operation and cleanliness of the Property. Notice of any action by Landlord referred to in this section, given to Tenant, shall have the same force and effect as if originally made a part of the foregoing Lease. New rules or regulations will not, however, be unreasonably inconsistent with the proper and rightful enjoyment of the Premises by Tenant under the Lease.

18.      These Building Rules are not intended to give Tenant any rights or claims in the event that Landlord does not enforce any of them against any other tenants or if Landlord does not have the right to enforce them against any other tenants and such nonenforcement will not constitute a waiver as to Tenant.

## EXHIBIT "C"

### TENANT ESTOPPEL CERTIFICATE

Please refer to the documents described in Schedule 1 hereto, (the "Lease Documents") including the "Lease" therein described; all defined terms in this Certificate shall have the same meanings as set forth in the Lease unless otherwise expressly set forth herein. The undersigned Tenant hereby certifies that it is the tenant under the Lease. Tenant hereby further acknowledges that it has been advised that the Lease may be collaterally assigned in connection with a proposed financing secured by the Property and/or may be assigned in connection with a sale of the Property and certifies both to Landlord and to any and all prospective mortgagees and purchasers of the Property, including any trustee on behalf of any holders of notes or other similar instruments, any holders from time to time of such notes or other instruments, and their respective successors and assigns (the "Beneficiaries") that as of the date hereof:

1.       The information set forth in attached Schedule 1 is true and correct.

2.       Tenant is in occupancy of the Premises and the Lease is in full force and effect, and, except by such writings as are identified on Schedule 1, has not been modified, assigned, supplemented or amended since its original execution, nor are there any other agreements between Landlord and Tenant concerning the Premises, whether oral or written.

3.       All conditions and agreements under the Lease to be satisfied or performed by Landlord have been satisfied and performed.

4.       Tenant is not in default under the Lease Documents, Tenant has not received any notice of default under the Lease Documents, and, to Tenant's knowledge, there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Tenant under the Lease Documents.

5.       Tenant has not paid any Rent due under the Lease more than 30 days in advance of the date due under the Lease and Tenant has no rights of setoff, counterclaim, concession or other rights of diminution of any Rent due and payable under the Lease except as set forth in Schedule 1.

6.       To Tenant's knowledge, there are no uncured defaults on the part of Landlord under the Lease Documents, Tenant has not sent any notice of default under the Lease Documents to Landlord, and there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Landlord thereunder, and that at the present time Tenant has no claim against Landlord under the Lease Documents.

7.       Except as expressly set forth in Part G of Schedule 1, there are no provisions for any, and Tenant has no, options with respect to the Premises or all or any portion of the Property.

8.       No action, voluntary or involuntary, is pending against Tenant under federal or state bankruptcy or insolvency law.

9.       The undersigned has the authority to execute and deliver this Certificate on behalf of Tenant and acknowledges that all Beneficiaries will rely upon this Certificate in purchasing the Property or extending credit to Landlord or its successors in interest.

10.      This Certificate shall be binding upon the successors, assigns and representatives of Tenant and any party claiming through or under Tenant and shall inure to the benefit of all Beneficiaries.

IN WITNESS WHEREOF, Tenant has executed this Certificate this _____ day of _____, 2_____.

```
_____
Name of Tenant

By:_____
Title:_____
```

## SCHEDULE 1 TO TENANT ESTOPPEL CERTIFICATE

<u>Lease Documents, Lease Terms and Current Status</u>

A.      Date of Lease:

B.      Parties:

  1.      Landlord:

  2.      Tenant:

C.      Premises:

D.      Modifications, Assignments, Supplements or Amendments to Lease:



E.      Commencement Date:

F.      Expiration of Current Term:

G.      Option Rights:

H.      Security Deposit Paid to Landlord: $

I.      Current Minimum Annual Rent: $

J.      Current Annual Operating Expenses: $

K.      Current Total Rent: $

L.      Square Feet Demised:

# Exhibit "D"
## JANITORIAL SPECIFICATIONS

| | Daily | Weekly | Monthly | Quarterly | Annually |
|---|---|---|---|---|---|
| **Entrances:** | | | | | |
| Police and spot sweep entrance and sidewalk picking up trash. | X | | | | |
| Clean cigarette urns, screen and replace sand if necessary. | X | | | | |
| Clean entrance lobby glass doors. | X | | | | |
| Clean all metal door thresholds and bright work using metal cleaner. | | X | | | |
| Dust fire pulls. | | X | | | |
| Sweep and/or vacuum entrance mats. | X | | | | |
| Thoroughly wash transoms, high & low. | X | | | | |
| Remove fingerprints and smudges from directory boards. | X | | | | |
| Maintain building lobby corridors and public areas in a clean condition. | X | | | | |
| **Common Areas:** | | | | | |
| Dust and vacuum air vents. | | | X | | |
| Hand wipe bright work. | X | | | | |
| All drinking fountains will be cleaned and metal polished. Remove any calcium deposits. | X | | | | |
| Remove all fingerprints from entrance doorways. | X | | | | |
| Walls, doors and painted woodwork shall be kept free of handprints and smudges which can be removed with a cloth and neutral cleaner. | X | | | | |
| Damp wipe and polish all glass furniture tops. | X | | | | |
| The trash receptacles, elevator lobby and common areas will be cleaned and polished. | X | | | | |
| Sweep and mop resilient floors. | X | | | | |
| Spot clean carpets. | | X | | | |
| Empty wastebaskets. Liners will be replaced if contaminated with foreign substances. | X | | | | |
| Vacuum carpet in public areas. | X | | | | |
| All hard surface floors will be damp mopped when dirt cannot be swept or dusted. Spots shall be removed daily. | X | | | | |
| Clean fire extinguisher cabinets. | | | X | | |
| If stairway and landing are carpeted, spot clean. | | X | | | |
| Wet mop risers in stairways and landings. | | X | | | |
| Strip and reseal all non-carpeted floors as required. | | | | | X |
| Clean cove base in common area, use materials required to remove wax, scuff marks and other markings from cove base. | | | | | X |
| Dust the exterior surfaces of lighting fixtures, including glass and plastic enclosures. | | | | | X |
| Damp dust all ceiling air conditioning diffusers, wall grills, registers and other ventilation louvers. | | | | | X |
| Wipe all interior metal window frames, mullions and other unpainted interior metal surfaces of the perimeter walls of the building each time the interiors of the windows are washed. | | | | | X |

# Exhibit "D"
## JANITORIAL SPECIFICATIONS

| | Daily | Weekly | Monthly | Quarterly | Annually |
|---|---|---|---|---|---|
| **Tenant Area:** | | | | | |
| Spot clean glass, walls and switch plates. | X | | | | |
| Vacuum high traffic areas in tenant space. | X | | | | |
| Detail vacuum all edges and corners with the necessary tools. | | | X | | |
| Empty wastebaskets.  Liners will be replaced if contaminated with foreign substances. | X | | | | |
| Clean conference room furniture. | X | | | | |
| Sweep and mop kitchens and break rooms. | X | | | | |
| Change trash can liners in breakrooms. | X | | | | |
| Wipe trash container lid. | | | X | | |
| Wash sink and wipe counter.  Leave dishes where found. | X | | | | |
| Wipe tables and chairs. | X | | | | |
| Hand dust and wipe clean with damp or treated cloth all office desks, furniture, files fixtures, paneling, window sills and all other horizontal surfaces not obstructed by tenant property. | | X | | | |
| Dust venetian blinds and window frames as required. | | | | X | |
| Dust all pictures/frames/charts/graphs and similar wall hangings weekly if necessary, no less than monthly. | | | | X | |
| Spot clean all interior lower glass partitions. | | | | X | |
| Dust all vertical surfacesto 60 inches. | | | | X | |
| | | | | | |
| **Restrooms:** | | | | | |
| Clean and polish all chrome and mirrors | X | | | | |
| Wipe all fixtures using disinfectant cleaner. | X | | | | |
| Refill dispensers with appropriate product. | X | | | | |
| Damp mop floor using disinfectant. | X | | | | |
| Wall and partitions are to be free of handprints, dust and water spots. | X | | | | |
| All feminine napkin waste receptacles shall have the bag insert replaced nightly. | X | | | | |
| Hand wipe all restroom wall surfaces as required but not less than monthly. | | | X | | |
| Machine scrub restrooms completely, disinfect as needed, more frequently as required. | | | | X | |

| Exhibit "D"<br>JANITORIAL SPECIFICATIONS | Daily | Weekly | Monthly | Quarterly | Annually |
|---|---|---|---|---|---|
| **Elevators:** | | | | | |
| Clean all elevator tracks. | X | | | | |
| Clean elevator call button panel and emergency telephone and telephone box. | X | | | | |
| The interior surfaces, door exteriors and fixtures of the elevators and the elevator lobby door shall be dusted, damp wiped and polished as necessary, no less than weekly. | | X | | | |
| Wipe clean all interior and exterior metals and architectural trim. | | X | | | |
| Dust entrance and elevator lobby walls. | | X | | | |
| | | | | | |
| **Janitor Closet:** | | | | | |
| Maintain MSDS Book | X | | | | |
| Maintain First Aide Kit | X | | | | |
| Maintain Bio-Hazard Kit | X | | | | |
| Scour, wash and rinse all slop sinks and utility bowls in janitors closet daily. | X | | | | |
| Keep janitors closet in clean, neat and orderly condition. | X | | | | |



TENANT IMPROVEMENTS FOR

# SSAI

I ENTERPRISE PARKWAY
HAMPTON, VIRGINIA

PRELIMINARY PLAN

EXHIBIT E







EXHIBIT F



EXHIBIT F

OXFORD PLAZA HAMPTON ROADS CENTER
VIRGINIA BEACH, VIRGINIA

SUITE LAYOUT PLAN - SECOND FLOOR

LIBERTY
PROPERTY TRUST

98-009.05 | 04/24/98
1"=20'-0" | 8000F-21



EXHIBIT F

## FIRST AMENDMENT TO DEED OF LEASE

THIS **FIRST AMENDMENT TO DEED OF LEASE** ("Amendment") is made as of the 1st day of December, 2006, by and between **LIBERTY PROPERTY LIMITED PARTNERSHIP**, a Pennsylvania limited partnership ("Landlord"), and **SCIENCE SYSTEMS AND APPLICATIONS, INC.**, a Maryland corporation ("Tenant").

## BACKGROUND

A.     Landlord and Tenant are parties to that certain Deed of Lease dated October 30, 2006 (the "Lease") covering certain premises known as Suite 160 ("Suite 160") and Suite 200 ("Suite 200") consisting of approximately 21,848 rentable square feet, and located at Oxford Plaza (the "Building"), One Enterprise Parkway, Hampton, VA 23666, as more fully described in the Lease.

B.     Landlord and Tenant have agreed to increase the amount of rentable square feet in the Building leased by Tenant pursuant to the Lease and to otherwise modify the Lease as set forth herein. Accordingly, Landlord and Tenant desire to amend the Lease.

NOW, **THEREFORE**, the parties hereto, in consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, agree that the Lease is amended as follows:

1.     _Premises_.  The Lease is hereby modified to provide that the "Premises" under the Lease, in addition to including Suite 160 and Suite 200, shall also be deemed to include Suite 140 ("Suite 140") in the Building, which Suite 140 consists of approximately 1,344 rentable square feet.  Accordingly, all references in the Lease to "Premises" shall be deemed to include Suite 140, Suite 160 and Suite 200, collectively consisting of approximately 23,192 rentable square feet.

2.     _Tenant's Share_.   The Lease is hereby modified to provide that Tenant's Share under the Lease shall be equal to 36.04%.

3.     _Minimum Annual Rent_.  In addition to the payment of Minimum Annual Rent for Suite 160 and Suite 200, Tenant shall also pay Minimum Annual Rent for Suite 140 in accordance with the terms of the Lease in the amounts set forth in the table below:

| LEASE YEAR | ANNUAL RENT | MONTHLY RENT |
|---|---|---|
| Lease Year 1 | $14,784.00 | $1,232.00 |
| Lease Year 2 | $15,227.52 | $1,268.96 |
| Lease Year 3 | $15,684.35 | $1,307.03 |
| Lease Year 4 | $16,154.88 | $1,346.24 |
| Lease Year 5 | $16,639.53 | $1,386.63 |

4.     _Annual Operating Expenses_. The Lease is hereby modified to provide that estimated Annual Operating Expenses for calendar year 2007 are equal to One Hundred Sixty-

Two Thousand Three Hundred Forty-Four and 00/100 Dollars ($162,344.00), payable in equal monthly installments of Thirteen Thousand Five Hundred Twenty-Eight and 67/100 Dollars ($13,528.67) each.

     5.     <u>Tenant Allowance</u>.

     (a)     The Lease is hereby modified by increasing the Tenant Allowance by Sixteen Thousand One Hundred Twenty-Eight and 00/100 Dollars ($16,128.00). Accordingly, the Tenant Allowance shall equal Two Hundred Seventy-Eight Thousand Three Hundred Four and 00/100 Dollars ($278,304.00).

     (b)     Upon fifteen (15) days prior written notice to Landlord, but in no event later than June 30, 2007, Tenant shall have the right to elect to receive an additional allowance (the "Additional Tenant Allowance") of up to Thirty Thousand and 00/100 Dollars ($30,000.00) for construction of improvements in the Premises by Tenant. Landlord and Tenant acknowledge that the Additional Tenant Allowance has not been factored into the Minimum Annual Rent payable by Tenant pursuant to the Lease and that the amount of such Additional Tenant Allowance, if elected by Tenant, shall be amortized over the period (the "Additional Tenant Allowance Amortization Period") of time commencing on the date the requested Additional Tenant Allowance is paid to Tenant by Landlord and continuing throughout the balance of the initial Term of the Lease using an assumed interest rate of ten percent (10%) per annum, and shall be paid by Tenant in equal monthly installments (the "Additional Allowance Rent") on the first day of each month during the Additional Tenant Allowance Amortization Period together with all other Monthly Rent owed under this Lease. Landlord shall have all rights and remedies with respect to Tenant's nonpayment of the Additional Allowance Rent as are provided under the Lease with respect to Tenant's nonpayment of Monthly Rent.

     6.     <u>Surrendered Items</u>. The former tenant of the Premises ("SAIC") and Tenant have entered into a separate agreement (the "Separate Agreement") whereby SAIC agreed to leave in the Premises, and Tenant agreed to accept, certain furniture, equipment, shelving and other related items for Tenant's temporary use of same in the Premises. However, as of the date of this Amendment, SAIC and Tenant have been unable to provide Landlord with a specific list of such items. Accordingly, Tenant agrees to accept the Premises from Landlord with all furniture, equipment, shelving and other related items left therein by SAIC (all such items left in the Premises by SAIC being hereinafter referred to collectively as the "Surrendered Items"). Tenant hereby releases Landlord from any responsibility or claims related to the Surrendered Items and/or the Separate Agreement and acknowledges that Tenant shall be fully responsible, at its sole cost and expense, for all costs related to the Surrendered Items (including, but not limited to, the relocation and removal thereof). The Surrendered Items shall be removed from the Premises no later than the expiration or sooner termination of the Term of the Lease.

     7.     <u>Miscellaneous</u>. Except as expressly modified herein, the terms and conditions of the Lease shall remain unchanged and in full force and effect. Capitalized terms not otherwise defined herein shall have the meaning set forth in the Lease. In the event of a conflict between the terms of the Lease and this Amendment, the terms of this Amendment shall govern.

<div align="center">

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

</div>

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Amendment to be duly executed under seal as of the day and year first above written.

LANDLORD:                    **LIBERTY PROPERTY LIMITED PARTNERSHIP**
                             By:    Liberty Property Trust, Sole General Partner

                             By:    _____
                                    Craig A. Cope
                                    Vice President & City Manager


TENANT:                      **SCIENCE SYSTEMS AND APPLICATIONS, INC.**

                             By:    _____
                                    Name:_____
                                    Title:_____
                                           Vice President, Finance &
                                           Administration

EXHIBIT "A"

FLOOR PLAN OF ADDITIONAL PREMISES

# SECOND AMENDMENT TO DEED OF LEASE

**THIS SECOND AMENDMENT TO DEED OF LEASE** ("Amendment") is made as of *CC* the *15th* day of ~~July~~, *August* 2007, by and between **LIBERTY PROPERTY LIMITED PARTNERSHIP**, a Pennsylvania limited partnership ("Landlord"), and **SCIENCE SYSTEMS AND APPLICATIONS, INC.**, a Maryland corporation ("Tenant").

## BACKGROUND

A.      Landlord and Tenant are parties to that certain Deed of Lease dated October 30, 2006, as amended by that certain First Amendment to Deed of Lease dated December 1, 2006 (collectively, the "Lease") covering certain premises known as Suites 140, 160 and 200 (collectively, the "Existing Premises") consisting of approximately 23,192 rentable square feet, and located at Oxford Plaza (the "Building"), One Enterprise Parkway, Hampton, VA 23666, as more fully described in the Lease.

B.      Tenant desires to expand the Existing Premises by leasing additional space in the Building, and Landlord has agreed to such expansion subject to the provisions of this Amendment.  Accordingly, Landlord and Tenant desire to amend the Lease.

**NOW, THEREFORE**, the parties hereto, in consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, agree that the Lease is amended as follows:

1.      Premises.  In addition to the Existing Premises, from and after August 1, 2007, Landlord shall lease to Tenant certain additional space in the Building known as Suite 220, consisting of approximately 3,472 rentable square feet and shown on the floor plan attached to this Amendment as Exhibit "A" (the "Additional Premises").  From and after August 1, 2007, the Premises shall consist of 26,664 rentable square feet and all references in the Lease, including this Amendment, to the "Premises" shall be deemed to include the Existing Premises and the Additional Premises.

2.      Minimum Annual Rent.

(a)      Commencing on the date of this Amendment, and continuing through October 31, 2007, Tenant shall continue to pay Minimum Annual Rent to Landlord for the Existing Premises in accordance with the terms of the Lease in the amounts set forth in the Lease.

(b)      Commencing on August 1, 2007, and continuing throughout the Term of the Lease, in addition to Minimum Annual Rent for the Existing Premises, Tenant shall also pay Minimum Annual Rent to Landlord for the Additional Premises in accordance with the terms of the Lease in the amounts set forth in the table below:

| Lease Year | Annual Rent | Monthly Rent |
| --- | --- | --- |

| Lease Year | Annual Rent | Monthly Rent |
|---|---|---|
| 8/1/07 – 11/30/07 | $38,192.00 | $3,182.67 |
| 12/1/07 – 11/30/08 | $39,337.76 | $3,278.15 |
| 12/1/08 – 11/30/09 | $40,517.89 | $3,376.49 |
| 12/1/09 – 11/30/10 | $41,733.43 | $3,477.79 |
| 12/1/10 – 10/31/11 | $42,985.43 | $3,582.12 |

3.   Annual Operating Expenses. Tenant shall continue to pay Annual Operating Expenses in accordance with the terms of the Lease. From and after August 1, 2007, Tenant's Proportionate Share under the Lease shall be 41.43%.

4.   Acceptance of Additional Premises; Allowance.   Landlord and Tenant acknowledge and agree that Tenant currently occupies the Existing Premises. Tenant accepts the Existing Premises and the Additional Premises in their present "as-is" conditions and acknowledges that Landlord has made no representations with respect thereto, it being understood and agreed that Landlord is under no duty to make any repairs, additions or decorations to the Existing Premises or to the Additional Premises. Notwithstanding the above, Landlord, at Landlord's sole expense, agrees to relocate the sink as shown on

5.   Voice and Data Communication Systems. Tenant, at its sole cost and expense, Exhibit A of shall be responsible for the installation, maintenance and repair of all telephone and data of this communication systems required by Tenant in the Additional Premises, and Tenant shall addendum. coordinate all work related to the installation of such telephone and data communication systems with the Building manager.

6.   Commission.

(a)   Tenant and Landlord represent and warrant to each other that Atlantic Real Estate Group, LLC ("Broker") is the only broker or finder that each has had any dealings, negotiations or consultations with relating to the Additional Premises or this Amendment on behalf of Tenant and that no other broker or finder called the Additional Premises to Tenant's attention for lease or took any part in any dealings, negotiations or consultations relating to the Additional Premises or this Amendment on Tenant's behalf.

(b)   Landlord shall pay a commission to Broker equal to three percent (3%) of the aggregate amount of the Minimum Annual Rent and Annual Operating Expenses to be paid by Tenant for the Additional Premises during the Term (exclusive of any renewal or extension term and further exclusive of any tenant improvement contribution paid by Tenant), such commission representing payment in full to Broker for all services rendered in connection with this Amendment or any modification, extension or renewal of the Lease or expansion of the Premises.   Such commission will be paid up front, upon full execution of this Amendment. Broker shall be the sole beneficiary of this Paragraph 6(b), and Tenant shall have no rights or claims against Landlord pursuant hereto.

(c)   Tenant agrees to be responsible for, indemnify, defend and hold harmless Landlord from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Landlord arising from any breach by

Tenant of Tenant's foregoing representation and warranty. Landlord agrees to be responsible for, indemnify, defend and hold harmless Tenant from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Tenant arising from any breach by Landlord of Landlord's foregoing representation and warranty.

7.     Miscellaneous.  Except as expressly modified herein, the terms and conditions of the Lease shall remain unchanged and in full force and effect. Capitalized terms not otherwise defined herein shall have the meaning set forth in the Lease.  In the event of a conflict between the terms of the Lease and this Amendment, the terms of this Amendment shall govern.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Amendment to be duly executed under seal as of the day and year first above written.

LANDLORD:           **LIBERTY PROPERTY LIMITED PARTNERSHIP**

By:    Liberty Property Trust, Sole General Partner

By:    _____
Craig A. Cope
Vice President & City Manager

TENANT:           **SCIENCE SYSTEMS AND APPLICATIONS, INC.**

By:    _____
Name: Anoop N. Mehta
Title: Vice President, Finance & Administration



## THIRD AMENDMENT TO DEED OF LEASE

THIS THIRD AMENDMENT TO DEED OF LEASE (the "Amendment") is made as of the 31st day of May, 2011, by and between **LIBERTY PROPERTY LIMITED PARTNERSHIP**, a Pennsylvania limited partnership (the "Landlord"), and **SCIENCE SYSTEM AND APPLICATIONS, INC.**, a Maryland corporation (the "Tenant").

### BACKGROUND:

A.      Landlord and Tenant are parties to a Deed of Lease dated October 30, 2006 (the "Original Lease"), as amended by a First Amendment to Deed of Lease dated December 1, 2006 (the "First Amendment") and a Second Amendment to Deed of Lease dated August 15, 2007 (the "Second Amendment") (the Original Lease, the First Amendment and the Second Amendment are referred to collectively as the "Lease"), for a premises (the "Existing Premises") that consists of approximately 26,664 rentable square feet and is known as Suites 140, 160, 210 and 220 at Oxford Plaza, One Enterprise Parkway, Hampton, Virginia  23666 (the "Building"), as more particularly described in the Lease.

B.      Tenant desires to expand the Existing Premises and to extend the Term of the Lease, and Landlord has agreed to such expansion and extension subject to the provisions of this Amendment.

### AGREEMENT:

NOW, THEREFORE, Landlord and Tenant, in consideration of the mutual promises and covenants contained in this Amendment and in the Lease, and intending to be legally bound by the terms of this Amendment, agree to amend the Lease as follows:

1.      Additional Premises.

(a)      In addition to the Existing Premises, from and after the Delivery Date (defined below), Landlord shall lease to Tenant, and Tenant shall lease from Landlord, the additional premises (the "Additional Premises") in the Building that consists of approximately 4,091 rentable square feet, is known as Suite 215 in the Building and is shown as the "Additional Premises" on the floor plan attached as Exhibit A to this Amendment.

(b)      From and after the Delivery Date, all references in the Lease to the "Premises" shall mean the Existing Premises and the Additional Premises.  Accordingly, the Premises shall consist of approximately 30,755 rentable square feet.

(c)      The "Delivery Date" shall be the date that Landlord delivers possession of the Additional Premises to Tenant with the Tenant Expansion Work (defined below) related to the Additional Premises (but not the Tenant Expansion Work related to the Existing Premises, if any) substantially complete.

1

2.    <u>Term</u>.

(a)    The Term of the Lease is extended so that the Term of the Lease expires on January 31, 2016. Accordingly, the "Expiration Date" shall be January 31, 2016.

(b)    "Expansion Lease Year" means the period from the earlier of (i) July 1, 2011 or (ii) Delivery Date through the succeeding twelve (12) full calendar months (including for the first Expansion Lease Year any partial month from the Delivery Date until the first day of the first full calendar month after the Delivery Date) and each successive twelve (12) month period thereafter during the remainder of the Term. However, the fifth Expansion Lease Year shall expire on January 31, 2016.

3.    <u>Minimum Annual Rent</u>.

(a)    If the Delivery Date occurs on or before June 30, 2011, then:

(i)    Continuing through June 30, 2011, Tenant shall continue to pay Minimum Annual Rent (as defined in the Lease) with respect to the Existing Premises pursuant to the terms of the Lease and in the amounts set forth in the Lease.

(ii)    Commencing on the Delivery Date, and continuing through June 30, 2011, Tenant shall pay Minimum Annual Rent for the Additional Premises pursuant to the terms of the Lease in equal monthly installments of Three Thousand Three Hundred Forty-Four and 39/100 Dollars ($3,344.39), pro rated for any partial month.

(iii)    Commencing on July 1, 2011, and continuing throughout the remainder of the Term of the Lease (as extended pursuant to this Amendment), Tenant shall pay Minimum Annual Rent for the Premises (as expanded pursuant to this Amendment) pursuant to Section 3(c) below.

(b)    If the Delivery Date occurs after June 30, 2011, then:

(i)    Continuing through June 30, 2011, Tenant shall continue to pay Minimum Annual Rent (as defined in the Lease) with respect to the Existing Premises pursuant to the terms of the Lease and in the amounts set forth in the Lease. From July 1, 2011, and continuing until the Delivery Date, Tenant shall pay Minimum Annual Rent for the Existing Premises pursuant to the terms of the Lease in equal monthly installments of Twenty-One Thousand Eight Hundred Ninety-Six and 39/100 ($21,896.39), prorated for any partial month.

(ii)    Commencing on the Delivery Date and continuing throughout the remainder of the Term of the Lease (as extended pursuant to this Amendment), Tenant shall pay Minimum Annual Rent for the Premises (as expanded pursuant to this Amendment) pursuant to Section 3(c) below.

(c)     Commencing on the later of (i) July 1, 2011 or (ii) the Delivery Date, and continuing throughout the remainder of the Term of the Lease (as extended pursuant to this Amendment), Tenant shall pay Minimum Annual Rent for the Premises (as expanded pursuant to this Amendment) pursuant to the terms of the Lease and in the amounts set forth in the following table:

| Expansion Lease Year | Minimum Annual Rent | Minimum Monthly Rent |
|---|---|---|
| 1<br>(Later of (i) 07/01/11 or (ii) Delivery Date – Last Day of First Expansion Lease Year) | $303,070.92 | $25,255.91 *CAC*<br>~~$25,142.21~~ |
| 2 | $312,122.16 | $26,010.18 |
| 3 | $321,444.84 | $26,787.07 |
| 4 | $331,047.24 | $27,587.27 |
| 5 | $340,937.76 | $28,411.48 |

4.     Annual Operating Expenses.

(a)     Tenant shall continue to pay Annual Operating Expenses (as defined in the Lease) in accordance with the terms of the Lease. From and after the Delivery Date, Tenant's Share (as defined in the Lease) shall be 48.80%.

(b)     In addition to Minimum Annual Rent, Annual Operating Expenses, and all other charges owed by Tenant under the Lease, Tenant shall pay the Supplemental HVAC Costs (as defined in the Lease) related to the heating, ventilation and air-conditioning system serving the Premises (as expanded pursuant to this Amendment), pursuant to the terms of the Lease. Landlord and Tenant agree that the Tenant Expansion Work includes the installation of a supplemental heating, ventilation and air-conditioning system serving the Additional Premises. From and after the Delivery Date, the Supplemental HVAC System (as defined in the Lease) shall mean the supplemental heating, ventilation and air conditioning system serving the Existing Premises and the supplemental heating, ventilation and air conditioning system serving the Additional Premises. Tenant shall be responsible for the maintenance, repair and replacement of the Supplemental HVAC System (including the supplemental heating, ventilation and air conditioning system serving the Additional Premises) pursuant to Section 32 of the Original Lease.

(c)     Landlord and Tenant agree that all Preventive Maintenance Costs (defined below) shall be included in Operating Expenses. However, any single Preventive Maintenance Cost greater than Thirty Thousand and 00/100 Dollars ($30,000.00) shall be amortized over the useful life of such preventive maintenance, and the annual amortization of such Preventive Maintenance Cost (including reasonable financing charges) shall be included in Operating Expenses. For purposes of this Amendment, "Preventive Maintenance Costs" shall mean all

3

costs, charges and expenses incurred by Landlord for care and service provided to the Property for the purpose of maintaining equipment and other facilities serving the Property in satisfactory operating condition by providing systematic inspection, detection and correction of incipient failures either before they occur or before they develop into major defects.

(d)     Landlord and Tenant agree that the costs of capital improvements or replacements shall not be included in Operating Expenses unless otherwise permitted as set forth in Rider 1 to the Original Lease.

(e)     Notwithstanding any provision in the Lease to the contrary, the Annual Operating Expenses for the period from January 1, 2011 through the day immediately prior to the Delivery Date shall be Sixteen Thousand Nine Hundred Seventy-Six and 08/100 Dollars ($16,976.08) per month, prorated for any partial month, and the Annual Operating Expenses for the period from the Delivery Date through December 31, 2011 shall be Nineteen Thousand Five Hundred Eighty and 68/100 Dollars ($19,580.68) per month, prorated for any partial month, without regard to any requirement in the Lease for reconciliation of the Annual Operating Expenses based on the actual Operating Expenses.

(f)     Notwithstanding any provision in the Lease to the contrary, Landlord waives Tenant's obligation to pay to Landlord the amount of Fifteen Thousand Ninety Seven and 00/100 Dollars ($15,097.00) for Tenant's underpayment of the Annual Operating Expenses owed by Tenant under the Lease for calendar year 2010 as disclosed in the reconciliation statement for calendar year 2010.

5.     Tenant Expansion Work.

(a)     Landlord shall construct certain improvements to the Premises (as expanded by this Amendment) (the "Tenant Expansion Work") in accordance with final plans and specifications attached as <u>Exhibit B</u> to this Amendment (the "Plans and Specifications"). The Tenant Expansion Work shall be done in a good and workmanlike manner and shall comply at the time of completion with all applicable laws and requirements of the governmental authorities having jurisdiction. Tenant agrees to pay Landlord, within ten (10) days after receipt of an invoice therefore, for the cost of any improvements to the Premises requested by Tenant and not shown on the Plans and Specifications. If the date of substantial completion of the Tenant Expansion Work is delayed by Tenant, the Delivery Date shall be the date that the Tenant Expansion Work would have been substantially completed if not for such Tenant delay.

(b)     Landlord and Tenant acknowledge and agree that Tenant will remain in the Existing Premises during Landlord's performance of the Tenant Expansion Work. Tenant acknowledges that the Tenant Expansion Work may cause disruption to Tenant's business operations in the Existing Premises, but Tenant agrees that in no event will such disruption be the basis for a claim of constructive eviction or otherwise entitle Tenant to an abatement of rent under the Lease. Landlord and Tenant further acknowledge and agree that all of Tenant's obligations under the Lease, including but not limited to Tenant's indemnity obligation under

4

F:\Electronic Leases\C Final Execution Version\bfd Science Systems and Applications Inc 3rd Amendment 051311 WS 1-1029639v7.docx

Section 8 of the Original Lease, shall be in effect while Landlord performs the Tenant Expansion Work.

(i)    Subject to the terms and conditions of the Lease related to Alterations (as defined in the Lease) to the Premises by Tenant, Tenant, at Tenant's sole expense, but subject to reimbursement by Landlord as set forth below, shall construct and install additional improvements to the Premises (as expanded by this Amendment (the "Additional Tenant Expansion Work").

(ii)    Landlord shall provide Tenant with an allowance (the "Additional Tenant Expansion Work Allowance") in an amount equal to the lesser of (A) Five Thousand and 00/100 Dollars ($5,000.00) or (B) the actual costs incurred by Tenant in connection with the Additional Tenant Expansion Work, to contribute to any costs incurred by Tenant related to the Additional Tenant Expansion Work.  The Additional Tenant Expansion Work Allowance shall not be used to reimburse Tenant for any costs related to the purchase and/or installation of any furniture, supplies, etc. used in connection with the operation of Tenant's business at the Premises.  Provided Tenant is not in default under the terms of the Lease beyond expiration of all applicable notice and cure periods, Landlord shall pay to Tenant the Additional Tenant Expansion Work Allowance within thirty (30) days after Tenant's completion of the Additional Tenant Expansion Work and Landlord's receipt from Tenant of a written request for payment of the Additional Tenant Expansion Work Allowance, together with a detailed summary and breakdown of Tenant's cost, invoices relating thereto and proof of payment of such invoices.

(c)    Notwithstanding Paragraph 5(a) above, Tenant, at Tenant's sole cost and expense, shall be responsible for the installation, maintenance and repair of all telephone and data communication systems required by Tenant in the Additional Premises, and Tenant shall coordinate all work related to the installation of such telephone data communication systems with the Building manager.

6.    Option to Terminate.  Section 31 of the Original Lease is deleted and replaced with the following:

Provided that an Event of Default has not occurred more than two (2) times preceding the Expiration Date, that there then exists no event of default by Tenant under this Lease nor any event that with the giving of notice and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, Tenant shall have the right and option to terminate this Lease at any time after the Delivery Date and during the current term of this Lease (but not any renewal or extension term), exercisable (a) by giving Landlord (i) a minimum of six (6) months' prior written notice (the "Termination Notice") thereof, and (ii) written proof satisfactory to Landlord that Tenant's contract with the National Aeronautics and Space Administration entitled "Science Technology and Research Support Services (STARRS II)" and numbered NNL11AA00B has been terminated through no fault of Tenant, and (b) by paying Landlord, within sixty (60) days after the Termination Notice, an amount (the "Termination Fee") equal

5

to the sum of (x) three (3) months of Minimum Annual Rent at the then-current rate, (y) three (3) months of Annual Operating Expenses at the then-current rate, and (z) the unamortized balance of all costs associated with this Amendment (including, but not limited to, internal leasing fees, brokerage commissions, legal fees and costs of the Tenant Expansion Work), with such costs to be amortized over the period commencing on November 1, 2011 and ending on the Expiration Date, using an assumed interest rate of ten percent (10%) per annum. Tenant shall pay all Rent under the Lease and abide by all of the terms and conditions of this Lease through and including such early termination date. Notwithstanding the foregoing, in the event that Tenant fails to pay the Termination Fee to Landlord within sixty (60) days after the Termination Notice, the Termination Notice shall be deemed null and void and this Lease shall remain in full force and effect unaffected by the Termination Notice. In addition, in the event that Tenant fails to pay the Termination Fee to Landlord within sixty (60) days after the Termination Notice, Tenant's right to terminate pursuant to this Section 6 of this Amendment shall be deemed null and void and Tenant shall no longer have a right to terminate this Lease pursuant to this Section 6 of this Amendment.

Landlord's approval:

_____
Senior Vice President, Regional Director

7.   <u>Notice Address</u>.

(a)   Landlord's address for notices required to be sent under the Lease shall be Liberty Property Limited Partnership, 208 Golden Oak Court, Suite 475, Virginia Beach, Virginia 23452.

(b)   Landlord's address to where Tenant shall send payment of Minimum Annual Rent, Annual Operating Expenses and all other charges owed under the Lease to Landlord shall be Liberty Property Limited Partnership, Post Office Box 828438, Philadelphia, Pennsylvania 19182-8438.

8.   <u>Commission</u>.

(a)   Tenant and Landlord represent and warrant to each other that Harvey Lindsay Commercial Real Estate ("Landlord's Broker") and Atlantic Real Estate Grp, L.L.C. ("Tenant's Broker") are the only brokers or finders that either has had any dealings, negotiations or consultations with relating to the Additional Premises or this Amendment and that no other broker or finder called the Additional Premises to Tenant's attention for lease or took any part in any dealings, negotiations or consultations relating to the Additional Premises or this Amendment on Tenant's behalf.

(b)   Landlord shall pay a commission to Landlord's Broker pursuant to a separate written agreement between Landlord and Broker, and a commission to Tenant's Broker pursuant to a separate written agreement between Landlord and Tenant's Broker, such

6

commissions representing payment in full to Landlord's Broker and Tenant's Broker for all services rendered in connection with this Amendment or any modification, extension or renewal of the Lease or expansion of the Premises. Such commission will be paid up front, upon full execution of this Amendment. Landlord's Broker and Tenant's Broker shall be the sole beneficiaries of this Paragraph 8(b)(a), and Tenant shall have no rights or claims against Landlord pursuant hereto.

(c)   Tenant agrees to be responsible for, indemnify, defend and hold harmless Landlord from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Landlord arising from any breach by Tenant of Tenant's foregoing representation and warranty. Landlord agrees to be responsible for, indemnify, defend and hold harmless Tenant from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Tenant arising from any breach by Landlord of Landlord's foregoing representation and warranty.

9.    Miscellaneous. Except as expressly modified in this Amendment, the terms and conditions of the Lease shall remain unchanged and in full force and effect. Capitalized terms not otherwise defined in this Amendment shall have the meanings set forth in the Lease. In the event of a conflict between the terms of the Lease and this Amendment, the terms of the Amendment shall govern.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Amendment as of the day and year first above written.

LANDLORD:               **LIBERTY PROPERTY LIMITED PARTNERSHIP**

                        By:    Liberty Property Trust, Sole General Partner


                        By: _____
                            Name:  Craig A. Cope
                            Title:  Vice-President and City Manager




TENANT:                 **SCIENCE SYSTEM AND APPLICATIONS, INC.**


                        By: _____
                            Name:  Anoop N. Mehta
                            Title:  Vice-President and CFO

7



**EXHIBIT A**



2ND FLOOR PLAN - LOCATIONS OF NEW WORK
CASEWORK NOTES
PLASTIC LAMINATE COUNTER TOPS W/ 4" BACKSPLASH (RETURN @ CORNERS)
PROVIDE FILLER PANELS/SCRIBES AS REQUIRED
4" WIRE PULLS FINISH TO MATCH HW
EUROPEAN HINGES W/ 1/8" MAX. GAP BETWEEN DOORS
VERIFY ALL DIMENSIONS PRIOR TO FABRICATION. CONFIRM ANY DISCREPANCIES WITH ARCHITECT PRIOR TO FABRICATIONS
1 COFFEE BAR ELEVATION
EXISTING BASE CABINETS
TYP. MICRO SHELF
2 COFFEE BAR ELEVATION
PROVIDE WATER LINE TO REFRIGERATOR
PROVIDE WATER LINE FOR TENANT PROVIDED COFFEE MAKER
PROVIDE GARBAGE DISPOSAL ON SMALL SINK BOWL
CODE INFORMATION:
GENERAL NOTES:
FRAMING NOTES:
RENOVATION NOTES:
FINISH NOTES:
WALL TO DECK
ACOUSTIC CEILING
3 5/8" MTL STUDS @ 1'-4" OC
5/8" GWB
6 1/2" SOUND BATTING
WALL SECTION
WALL SECTION
WALL SECTION
DETAIL @ WINDOW MULLION/ WALL INTERSECTIONS
EXHIBIT "B"
TENANT MODIFICATIONS FOR SSAI
1 ENTERPRISE PKWY, 2ND FLOOR, HAMPTON, VA
LOCATION PLAN, SECTIONS, NOTES AND ELEVATIONS
MORRISETTE ARCHITECTURE
Architecture, Planning and Interior Design
5204 Edgewater Dr Norfolk VA 23508 tfm@MorrisetteArchitecture.com 757-627-0268
sheet
A-1

EXHIBIT "B"



EXHIBIT "B"

<u>FOURTH AMENDMENT TO DEED OF LEASE</u>

THIS FOURTH AMENDMENT TO DEED OF LEASE (this "<u>Amendment</u>") is made as of September 30, 2015, by and between LCP HAMPTON ROADS III, LLC, a Delaware limited liability company ("<u>Landlord</u>"), and SCIENCE SYSTEMS AND APPLICATIONS INC., a Maryland corporation ("<u>Tenant</u>").

W I T N E S S E T H:

<u>Recitals</u>

Landlord (as successor by assignment to Liberty Property Limited Partnership) and Tenant are parties to that certain Deed of Lease dated October 30, 2006, as amended by First Amendment to Deed of Lease dated December 1, 2006, and by Second Amendment to Deed of Lease dated August 15, 2007, and by Third Amendment to Deed of Lease dated May 31, 2011 (the "<u>Third Amendment</u>") (collectively, the "<u>Lease</u>"), for certain premises consisting of 30,755 rentable square feet known as Suites 140, 160, 210, 215 and 220 (the "<u>Premises</u>") in the building known as Oxford Plaza, located at 1 Enterprise Parkway in Hampton, Virginia (the "<u>Building</u>"), as more fully described in the Lease.

The Lease is scheduled to expire on January 31, 2016. Tenant is a candidate for the award by the National Aeronautics and Space Administration ("<u>NASA</u>") of a new Science, Technology and Research Support Services contract (STARSS III, RFP #NNL15ZB1003R) to provide science, technology and research support services for NASA's Langley Research Center in Hampton, Virginia (the "<u>STARSS Contract</u>"). The parties now desire to amend the Lease to extend the term of the Lease, subject to the awarding of the STARSS Contract, and otherwise as provided herein.

<u>Amendment</u>

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      <u>Defined Terms</u>.  Unless otherwise indicated herein, all capitalized terms used herein shall have the meaning set forth in the Lease.

2.      <u>Extension of Term</u>.  The term of the Lease shall be extended for a period of sixty (60) full calendar months, commencing on February 1, 2016, and expiring January 31, 2021, subject to the terms and conditions of Sections 3 and 4 of this Amendment (the "<u>Extended Term</u>"). Landlord and Tenant acknowledge and agree that Tenant has no further rights or options to renew the Lease or expand the Premises.

3.      STARSS Contract.  If, on or prior to January 31, 2016, NASA awards the STARSS Contract to Tenant, then the Extended Term shall commence and expire as set forth in Section 2 above; otherwise, Tenant shall continue to lease and occupy the Premises at the Monthly Rent applicable to the immediately prior Lease Year and otherwise pursuant to the terms and conditions of the Lease until the earliest of (i) the date that NASA awards the STARSS Contract to Tenant, in which event the Extended Term shall commence on the date that is the STARSS Contract commencement date and shall expire on the last day of the sixtieth (60th) full calendar month thereafter, or (ii) the date that NASA awards the STARSS Contract to an entity other than Tenant or notifies Tenant that Tenant is no longer being considered for the STARSS Contract, in which event Landlord or Tenant shall have the right to terminate this Lease effective thirty (30) days following the delivery of written notice to the other (but in no event shall such termination be effective earlier than January 31, 2016) or (iii) June 30, 2016, after which date Landlord may terminate this Lease upon written notice to Tenant if the Extended Term has not yet commenced.

4.      Option to Terminate.  Provided Tenant has provided Landlord with a true and correct copy of the termination clauses within the STARSS Contract prior to the commencement of the Extended Term, and further provided that an Event of Default has not occurred more than two (2) times preceding the Expiration Date, that there then exists no event of default by Tenant under this Lease, as amended hereby, nor any event that with the giving of notice and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, Tenant shall have the right and option to terminate this Lease at any time during the Extended Term, exercisable (a) by giving Landlord (i) a minimum of six (6) months' prior written notice (the "Extended Term Termination Notice") thereof, and (ii) written proof satisfactory to Landlord that the STARSS Contract has been terminated through no fault of Tenant, and (b) by paying Landlord, within sixty (60) days after the Extended Term Termination Notice, an amount (the "Extended Term Termination Fee") equal to the sum of (x) three (3) months of Minimum Annual Rent at the then-current rate, (y) three (3) months of Annual Operating Expenses at the then-current rate, and (z) the unamortized balance of all costs associated with this Amendment (including, but not limited to, internal leasing fees, brokerage commissions, legal fees and costs of the Extended Term Improvement Work (as hereinafter defined)), with such costs to be amortized over the period commencing on the first day of the first full calendar month of the Extended Term and ending on the last day of the Extended Term, using an assumed interest rate of ten percent (10%) per annum.  Tenant shall pay all Rent under the Lease and abide by all of the terms and conditions of this Lease through and including such early termination date.  Notwithstanding the foregoing, in the event that Tenant fails to pay the Extended Term Termination Fee to Landlord within sixty (60) days after the Extended Term Termination Notice, the Extended Term Termination Notice shall be deemed null and void and this Lease shall remain in full force and effect unaffected by the Extended Term Termination Notice.  In addition, in the event that Tenant fails to pay the Extended Term Termination Fee to Landlord within sixty (60) days after the Extended Term Termination Notice, Tenant's right to terminate pursuant to this Section 4 of this Amendment shall be deemed null and void and Tenant shall no longer have a right to terminate this Lease pursuant to this Section 4 of this Amendment.  For purposes of clarity, Landlord and Tenant acknowledge and agree that Section 6 of the Third Amendment is hereby void and of no further effect and that Tenant has no options for early termination of the Lease except as provided in this Amendment.

2

5.    Rent During Extended Term.  Commencing on the first day of the Extended Term, Tenant shall pay Minimum Annual Rent for the Premises pursuant to the terms of the Lease and in the amounts set forth in the following schedule*:

| Lease Year During Extended Term | Monthly Installments | Annualized |
|---|---|---|
| Months 1 – 12 | $26,269.90† | $315,238.80 |
| Months 13 – 24 | $27,058.00 | $324,696.00 |
| Months 25 – 36 | $27,869.74 | $334,436.88 |
| Months 37 – 48 | $28,705.83 | $344,469.96 |
| Months 49 – 60 | $29,567.00 | $354,804.00 |

* Tenant shall continue to be responsible for payment of Tenant's Share of Operating Expenses in accordance with the terms of the Lease.

† plus, for any partial month from the date the Extended Term commences until the first day of the next full calendar month, a prorated monthly installment of Minimum Annual Rent for such period based on the number of days in such partial month and the amount of the monthly installment specified in the chart above.

6.    Improvements.

(a)    Following commencement of the Extended Term, Landlord shall construct improvements to the Premises in accordance with plans and specifications and a construction schedule and budget to be prepared by Landlord and mutually agreed upon by Landlord and Tenant (the "4th Amendment Work").  The 4th Amendment Work shall be done in a good and workmanlike manner and shall comply at the time of completion with all applicable laws and requirements of the governmental authorities having jurisdiction.

(b)    Landlord and Tenant acknowledge and agree that Tenant will remain in the Premises during Landlord's performance of the 4th Amendment Work.  Tenant acknowledges that the 4th Amendment Work may cause disruption to Tenant's business operations in the Premises, but Tenant agrees that in no event will such disruption be the basis for a claim of constructive eviction or otherwise entitle Tenant to an abatement of Rent under the Lease. Landlord and Tenant further acknowledge and agree that all of Tenant's obligations under the Lease, including but not limited to Tenant's indemnity obligation under Section 8 of the Original Lease, shall be in effect while Landlord performs the 4th Amendment Work.

(c)    Landlord shall be responsible for the cost of preparing the plans, specifications, schedule and budget and for the cost of performing the 4th Amendment Work up to a maximum cost of Five Dollars ($5.00) per rentable square foot of the Premises or a total of One Hundred Fifty-Three Thousand Seven Hundred Seventy-Five and no/100 Dollars ($153,775.00) (the "Cost Cap").  Tenant shall be responsible for any costs of the 4th Amendment Work that exceed the Cost Cap and shall reimburse Landlord for such costs within thirty (30) days after receipt of an invoice and reasonable documentation for such costs.  In the event Landlord's actual costs of the 4th Amendment Work are less than the Cost Cap, then the difference between the actual costs of the 4th Amendment Work and the Cost Cap shall be deemed an allowance (the "Allowance") that Tenant may use during the first eighteen (18) calendar months following

3

completion of the 4th Amendment Work, after which it will expire. Tenant may apply the Allowance, if any, toward moving expenses, furniture, trade fixtures/equipment and cabling within the Premises. Any furniture, trade fixtures/equipment and cabling purchased with the Allowance shall be and remain the personal property of Tenant and may be removed by Tenant upon expiration of the Lease. Tenant may also apply any Allowance, up to a maximum of $2.50 per rentable square foot of the Premises, as a credit against installments of Monthly Rent until fully exhausted.

      7.    <u>Brokerage Commissions</u>. Landlord and Tenant each represents and warrants to the other that it has not employed or worked with any broker, agent, or finder in connection with this Amendment other than Atlantic Real Estate GRP, LLC, which represents Tenant ("Tenant's Broker"), and Lingerfelt Commonwealth Partners HR, LLC, which represents Landlord ("Landlord's Broker"). Landlord shall be responsible for paying a commission to Landlord's Broker, which will pay Tenant's Broker, pursuant to separate agreements; provided that Tenant's Broker shall have the option to refer payment of a portion of its commission directly to Tenant. Landlord and Tenant each agrees to indemnify, defend and hold harmless the other and their directors, officers and employees from and against all threatened or asserted claims, liabilities, costs and damages (including reasonable attorney's fees and disbursements) which may occur as a result of a breach of this representation and warranty.

      8.    <u>Notices</u>. Effective immediately, Landlord's address for notices as set forth in the Lease is hereby replaced with the following:

> <u>Address for Mail</u>:
> LCP Hampton Roads III, LLC
> c/o LingComm, LLC
> P. O. Box 71150
> Richmond, Virginia  23255
>
> <u>Address for Overnight or By Hand Deliveries</u>:
> LCP Hampton Roads III, LLC
> c/o LingComm, LLC
> 4198 Cox Road, Suite 200
> Richmond, Virginia  23060

      9.    <u>Ratification; Counterparts</u>. Except as expressly modified herein, the terms and conditions of the Lease are hereby ratified and confirmed and shall remain unchanged and in full force and effect. This Amendment may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument, and facsimile and electronically-scanned signatures shall be deemed to be original signatures and of the same force and effect.

     IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the day and year first above written.

<center>4</center>

LANDLORD:

LCP HAMPTON ROADS III, LLC,
a Delaware limited liability company

By: _____
Name: J. Ryan Lingerfelt
Title: President


TENANT:

SCIENCE SYSTEMS AND APPLICATIONS INC.,
a Maryland corporation


By: _____
Name: _LINDA AGUIRRE_
Title: _VP OF FINANCE_

5

## FIFTH AMENDMENT TO DEED OF LEASE

THIS FIFTH AMENDMENT TO DEED OF LEASE (this "Amendment") is made as of January $\underline{8^{th}}$, 2021, by and between HAMPTON ROADS III OWNER, LLC, a Delaware limited liability company ("Landlord"), and SCIENCE SYSTEMS AND APPLICATIONS INC., a Maryland corporation ("Tenant").

### WITNESSETH:

Recitals

Landlord (as successor by assignment to LCP Hampton Roads III, LLC, and Liberty Property Limited Partnership) and Tenant are parties to that certain Deed of Lease dated October 30, 2006, as amended by First Amendment to Deed of Lease dated December 1, 2006, and by Second Amendment to Deed of Lease dated August 15, 2007, and by Third Amendment to Deed of Lease dated May 31, 2011 (the "Third Amendment"), and by Fourth Amendment to Deed of Lease dated September 30, 2015 (the "Fourth Amendment") (collectively, the "Lease"), for certain premises consisting of 30,755 rentable square feet known as Suites 140, 160, 210, 215 and 220 (the "Premises") in the building known as Oxford Plaza, located at 1 Enterprise Parkway in Hampton, Virginia (the "Building"), as more fully described in the Lease.

The Lease is scheduled to expire on May 31, 2021. Tenant is a candidate for the award by the National Aeronautics and Space Administration ("NASA") of a competitive follow-on contract to the current Science, Technology and Research Support Services (STARSS III) contract to provide science, technology and research support services for NASA's Langley Research Center in Hampton, Virginia (the "Follow-On STARSS Contract"). The parties now desire to amend the Lease to extend the term of the Lease and otherwise as provided herein.

Amendment

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.  Defined Terms. Unless otherwise indicated herein, all capitalized terms used herein shall have the meaning set forth in the Lease.

2.  Extension of Term.

    (a) The term of the Lease shall be extended for a period of six (6) full calendar months commencing on June 1, 2021, expiring November 30, 2021 (the "Short-Term Extension").

    (b) Upon the completion of the Short-Term Extension, the term of the Lease shall be extended for an additional period of sixty (60) full calendar months, commencing on December 1, 2021, and expiring November 30, 2026, subject to the terms and conditions of Sections 3 and 4 of this Amendment (the "Fifth Amendment Term"). Landlord and Tenant

acknowledge and agree that Tenant has no further rights or options to renew the Lease or expand the Premises.

       3.     Follow-On STARSS Contract. If, on or prior to November 30, 2021, NASA awards the Follow-On STARSS Contract to Tenant, then the Fifth Amendment Term shall commence and expire as set forth in Section 2 above; otherwise, Tenant shall continue to lease and occupy the Premises at the Monthly Rent applicable to the immediately prior Lease Year and otherwise pursuant to the terms and conditions of the Lease until the earliest of (i) the date that NASA awards the Follow-On STARSS Contract to Tenant, in which event the Fifth Amendment Term shall commence on the date that is the Follow-On STARSS Contract commencement date and shall expire on the last day of the sixtieth (60th) full calendar month thereafter, or (ii) the date that NASA awards the Follow-On STARSS Contract to an entity other than Tenant or notifies Tenant that Tenant is no longer being considered for the Follow-On STARSS Contract, in which event Landlord or Tenant shall have the right to terminate this Lease effective thirty (30) days following the delivery of written notice to the other (but in no event shall such termination be effective earlier than November 30, 2021) or (iii) May 31, 2022, after which date Landlord may terminate this Lease upon written notice to Tenant if the Fifth Amendment Term has not yet commenced. Promptly following Tenant's learning of the name, RFP number and/or any other relevant identifying information for the Follow-On STARSS Contract, but in no event later than the awarding of the Follow-On STARSS Contract to Tenant, Tenant shall notify Landlord of such identifying information and the parties shall execute an addendum to this Amendment confirming such identifying information.

       4.     Option to Terminate. Provided Tenant has provided Landlord with a true and correct copy of the termination clauses within the Follow-On STARSS Contract prior to the commencement of the Fifth Amendment Term, and further provided that an Event of Default has not occurred more than two (2) times preceding the Expiration Date, that there then exists no event of default by Tenant under this Lease, as amended hereby, nor any event that with the giving of notice and/or the passage of time would constitute a default, and that Tenant is the sole occupant of the Premises, Tenant shall have the right and option to terminate this Lease at any time during the Fifth Amendment Term, exercisable (a) by giving Landlord (i) a minimum of six (6) months' prior written notice (the "Fifth Amendment Term Termination Notice") thereof, and (ii) written proof satisfactory to Landlord that the Follow-On STARSS Contract has been terminated through no fault of Tenant, and (b) by paying Landlord, within sixty (60) days after the Fifth Amendment Term Termination Notice, an amount (the "Fifth Amendment Term Termination Fee") equal to the sum of (x) three (3) months of Minimum Annual Rent at the then-current rate, (y) three (3) months of Annual Operating Expenses at the then-current rate, and (z) the unamortized balance of all costs associated with this Amendment (including, but not limited to, internal leasing fees, brokerage commissions, legal fees and costs of the Fifth Amendment Term Improvement Work (as hereinafter defined)), with such costs to be amortized over the period commencing on the first day of the first full calendar month of the Fifth Amendment Term and ending on the last day of the Fifth Amendment Term, using an assumed interest rate of ten percent (10%) per annum. Tenant shall pay all Rent under the Lease and abide by all of the terms and conditions of this Lease through and including such early termination date. Notwithstanding the foregoing, in the event that Tenant fails to pay the Fifth Amendment Term Termination Fee to Landlord within sixty (60) days after the Fifth Amendment Term Termination Notice, the Fifth Amendment Term

2

Termination Notice shall be deemed null and void and this Lease shall remain in full force and effect unaffected by the Fifth Amendment Term Termination Notice. In addition, in the event that Tenant fails to pay the Fifth Amendment Term Termination Fee to Landlord within sixty (60) days after the Fifth Amendment Term Termination Notice, Tenant's right to terminate pursuant to this Section 4 of this Amendment shall be deemed null and void and Tenant shall no longer have a right to terminate this Lease pursuant to this Section 4 of this Amendment. For purposes of clarity, Landlord and Tenant acknowledge and agree that Section 6 of the Third Amendment and Section 4 of the Fourth Amendment are hereby void and of no further effect and that Tenant has no options for early termination of the Lease except as provided in this Amendment.

     5.    Rent During Fifth Amendment Term.

     (a)    During the Short-Term Extension, Tenant shall pay Minimum Annual Rent for the Premises pursuant to the terms of the Lease and in the amounts set forth in the following schedule:

| Short-Term Extension | Monthly Installments | Annualized |
|---|---|---|
| 6/1/2021 – 11/30/2021 | $29,567.00 | $354,804.00 |

     (b)    Commencing on the first day of the Fifth Amendment Term, Tenant shall pay Minimum Annual Rent for the Premises pursuant to the terms of the Lease and in the amounts set forth in the following schedule*:

| Lease Year During Fifth Amendment Term | Monthly Installments | Annualized |
|---|---|---|
| Months 1 – 12 | $25,706.05† | $308,472.60 |
| Months 13 – 24 | $26,477.23 | $317,726.76 |
| Months 25 – 36 | $27,271.55 | $327,258.60 |
| Months 37 – 48 | $28,089.69 | $337,076.28 |
| Months 49 – 60 | $28,932.39 | $347,188.68 |

\* Tenant shall continue to be responsible for payment of Tenant's Share of Operating Expenses in accordance with the terms of the Lease.
† plus, for any partial month from the date the Fifth Amendment Term commences until the first day of the next full calendar month, a prorated monthly installment of Minimum Annual Rent for such period based on the number of days in such partial month and the amount of the monthly installment specified in the chart above.

     6.    Condition of Premises; Improvements.

     (a)    Following commencement of the Fifth Amendment Term, Landlord shall, at Landlord's expense, construct improvements to the Premises generally in accordance with the plans attached hereto as Exhibit A and made a part hereof (the "5th Amendment Work"). The 5th Amendment Work shall be done in a good and workmanlike manner and shall comply at the time of completion with all applicable laws and requirements of the governmental authorities having jurisdiction.

J:\Bruker\ACME - REaltaN.EASING\FINAL LEASES\Science Systems and Applications - 5th Am. to Lease - Oxford Plaza - Hampton Roads III Owner, LLC TS\11028244v5 1.8.2020.docx

(b)     Landlord and Tenant acknowledge and agree that Tenant will remain in the Premises during Landlord's performance of the 5th Amendment Work.  Tenant acknowledges that the 5th Amendment Work may cause disruption to Tenant's business operations in the Premises, but Tenant agrees that in no event will such disruption be the basis for a claim of constructive eviction or otherwise entitle Tenant to an abatement of Rent under the Lease.  Landlord and Tenant further acknowledge and agree that all of Tenant's obligations under the Lease, including but not limited to Tenant's indemnity obligation under Section 8 of the Original Lease, shall be in effect while Landlord performs the 5th Amendment Work.

(c)     Except for the 5th Amendment Work, the parties hereto acknowledge and agree that Landlord shall have no obligation to make or pay for any improvements to the Premises or the Building in connection with this Amendment and Tenant accepts the Premises in its "AS IS" condition, subject to the 5th Amendment Work.  Tenant, at its sole cost and expense, shall be responsible for the installation, relocation and/or removal of all telephone and data communication systems required by Tenant in the Premises, as reduced hereby, and Tenant shall coordinate all work related to such installation, relocation and removal with the property manager for the Building.

7.     Option to Reduce Premises.  Tenant hereby has the option to reduce the Premises during the 5th Amendment Term by up to 7,177 rentable square feet of space (the "Reduction Option") in accordance with the terms and conditions of this Section 7:

(a)     Tenant may exercise its Reduction Option by delivering written notice to Landlord at any time during the 5th Amendment Term, time being of the essence (the "Reduction Notice").  If Tenant provides a timely Reduction Notice to Landlord of its exercise of the Reduction Option, then the reduction pursuant to this Section 7 shall be effective as of the later of the termination date specified in the Reduction Notice and the last day of the third (3rd) full calendar month following the date the Reduction Notice is received by Landlord (the "Reduction Date").  Tenant may exercise its Reduction Option in multiple phases during the 5th Amendment Term provided the cumulative reduction is no greater than 7,177 rentable square feet of the Premises.

(b)     The portions of the Premises which are eligible for removal from the Premises pursuant to Tenant's exercise of its Reduction Option are shown more particularly on Exhibit B, attached hereto as a part hereof.  Tenant's Reduction Notice shall identify some or all of the portions of the Premises which are eligible for the Reduction Option, not to exceed a total of 7,177 rentable square feet, which Tenant proposes to remove from the Premises.  Upon Landlord's receipt of Tenant's Reduction Notice, Landlord and Tenant shall cooperate in good faith to mutually agree on the exact space to be removed from the Premises (the "Reduction Space"), taking into account Tenant's proposal and ensuring the following criteria are met: (i) it is separately marketable as a standalone suite (or together with contiguous vacant space) to a third party tenant; (ii) it is internally contiguous as a marketable block; and (iii) it has elevator lobby access.  After Landlord and Tenant have mutually agreed on the Reduction Space, they shall enter an amendment to the Lease to memorialize the removal of the Reduction Space from the Premises effective as of the Reduction Date and, upon the Reduction Date, Tenant shall surrender to Landlord and release to Landlord all of Tenant's right, title and interest in the Reduction Space in

4

accordance with terms and provisions of the Lease applicable to the surrender of the Premises. Such amendment shall also adjust those terms of the Lease which relate to or are dependent upon the size of the Premises (e.g., Minimum Annual Rent and Tenant's Share).

(c)     Tenant's delivery of the Reduction Notice shall be deemed an irrevocable exercise of its Reduction Option and, any time after Tenant exercises its Reduction Option, Landlord may lease and/or market the Reduction Space for lease to a third party and may enter the Reduction Space on reasonable advance notice for the purpose of showing the space to prospective tenants.

(d)     Tenant's exercise of its Reduction Option shall not be effective unless and until Tenant has paid to Landlord a fee for early surrender of the Reduction Space. The amount of the fee for early surrender of the Surrender Space (the "Reduction Fee") shall be equal to the unamortized balance of the Commission Costs and the Improvement Costs (all as hereinafter defined), all such costs being amortized over the 5th Amendment Term using an interest factor of eight percent (8%). Following the determination of the Reduction Space as provided above, Landlord shall provide Tenant with its substantiated calculation of the Reduction Fee. For purposes of this Section, (i) the "Commission Costs" shall be equal to the product of the total amount of commissions paid by Landlord to Landlord's Broker and Tenant's Broker pursuant to this Amendment times a fraction, the numerator of which is the rentable square footage of the Reduction Space and the denominator of which is the rentable square footage of the Premises (the "Reduction Factor"); and (ii) the "Improvement Costs" shall be equal to the product of the hard and soft costs incurred by Landlord with respect to the 5th Amendment Work times the Reduction Factor.

8.     Brokerage Commissions: Landlord and Tenant each represents and warrants to the other that it has not employed or worked with any broker, agent, or finder in connection with this Amendment other than Atlantic Real Estate GRP, LLC, which represents Tenant ("Tenant's Broker"), and Divaris Real Estate, Inc., which represents Landlord ("Landlord's Broker"). Landlord shall be responsible for paying a commission to Landlord's Broker, which will pay Tenant's Broker, pursuant to separate agreements. Landlord and Tenant each agrees to indemnify, defend and hold harmless the other and their directors, officers and employees from and against all threatened or asserted claims, liabilities, costs and damages (including reasonable attorney's fees and disbursements) which may occur as a result of a breach of this representation and warranty.

9.     Addresses for Notices; Payment Instructions.

(a)     The Lease is hereby amended to provide the following addresses for notices to Landlord:

Hampton Roads III Owner, LLC
c/o REalta Group
6851 Jericho Turnpike, Suite 200
Syosset, NY 11791

5

With copies to:

Hampton Roads III Owner, LLC
c/o Acme Equities LLC
745 Fifth Avenue, 6th Floor
New York, New York 10151
Attention: Lawrence A. Heller

and

Divaris Property Management Corp.
4525 Main Street, #900
Virginia Beach, VA 23462
Attn: Michael B. Divaris, President & COO
Email: mdivaris@divaris.com

(b)      Unless otherwise instructed in a written notice from Landlord to Tenant, all rents, additional rents and other charges under the Lease shall be made payable to "Hampton Roads V Owner, LLC, for the benefit of LoanCore Capital Markets LLC, as beneficiary, Account No. 1069949681" per the delivery instructions below.

Payments in the form of a check shall be sent to:

By mail:
Hampton Roads V Owner, LLC
P.O. Box 823931
Philadelphia, PA 19182-3931

or

By overnight courier:

PNC Bank, National Association
c/o Hampton Roads V Owner, LLC, Lockbox Number 823931
525 Fellowship Rd, Suite 330
Mt. Laurel, NJ 08054-3415

Payments made by wire transfer shall use the following instructions:

Account Name:  Hampton Roads V Owner, LLC, for the benefit of
               LoanCore Capital Markets LLC, as secured party
Account No:    1069949681
ABA No.:       043000096
Ref:    Hampton Roads V Owner, LLC

6

10.    Ratification; Counterparts. Except as expressly modified herein, the terms and conditions of the Lease are hereby ratified and confirmed and shall remain unchanged and in full force and effect. This Amendment may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument, and facsimile and electronically-scanned signatures shall be deemed to be original signatures and of the same force and effect.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the day and year first above written.

LANDLORD:

HAMPTON ROADS III OWNER, LLC,
a Delaware limited liability company

By: _____
Name: Nate Streicher
Title: Vice President


TENANT:

SCIENCE SYSTEMS AND APPLICATIONS INC.,
a Maryland corporation


By: _____
Name: _LINDA AGUIRRE_____
Title: _CFO_____

8

EXHIBIT A

Plans for 5th Amendment Work

(see sheets A-1 and A-2 on following two pages)



EXHIBIT B

Plan Showing Eligible Reduction Space

(see next 4 pages)



LOCATION PLAN

**SSAI - GIVE BACK 1**

1 ENTERPRISE PKWY, SUITE 140
1,344 SFR

11.13.2020
1/8" = 1'-0"

**MORRISETTE ARCHITECTURE**
Architecture, Planning and Interior Design

13



LOCATION PLAN

SSAI - GIVE BACK 2

1 ENTERPRISE PKWY, SUITE 200
1,918 SFR

11.13.2020
1/8"=1'-0"

MORRISETTE ARCHITECTURE
Architecture, Planning and Interior Design

14



LOCATION PLAN

11.13.2020
N.T.S.

MORRISETTE ARCHITECTURE
Architecture, Planning and Interior Design

SSAI - GIVE BACK 3

1 ENTERPRISE PKWY, SUITE 200
2,277 SFR

15



LOCATION PLAN

**SSAI - GIVE BACK 4**

1 ENTERPRISE PKWY, SUITE 200
1,638 SFR

11.13.2020
N.T.S.

MORRISETTE ARCHITECTURE
Architecture, Planning and Interior Design

16



SUITE 160

SUITE 140

FIRST FLOOR PLAN

Exhibit A 

Attachment A, Page 2



 **SCIENCE SYSTEMS AND APPLICATIONS, INC.**
*Science and Technology with Passion*

April 30, 2023

Hampton Roads III Owner, LLC
c/o Realta Group
6851 Jericho Turnpike, Suite 200
Syosset, NY 11791

Dear Sirs,

Please be aware that NASA has notified SSAI that it is no longer being considered for the follow on STARRS contract. As per Section 3(ii) of the Fifth Amendment to Deed of Lease dated January 8th, 2021, we are hereby exercising the right to terminate the lease with the termination date to be thirty days from the receipt of this notice.

We have enjoyed our tenancy at Oxford Plaza and thank you for the many years of service you have afforded us. We hope to secure future NASA contracts and hope to have the opportunity to have you as our landlord again.

If you have any questions, please contact our broker, John Blick at Atlantic Real Estate Grp, LLC. John can be reached at 301-370-1234 and jblick@arellc.com.

Sincerely,

**Rachit Mahajan, CPA**
CFO
rachit.mahajan@ssaihq.com
301.867.6306  Direct
703.434.0525  Mobile
**Science Systems and Applications, Inc.**
*Science and Technology with Passion*
10210 Greenbelt Road, Suite 600
Lanham, MD 20706
www.ssaihq.com

cc: Divaris Property Management
    4525 Main Street, Suite 900
    Virginia Beach, VA 23462
    Attention: Michael B. Divaris, President &COO

**SSAI HEADQUARTERS**
10210 Greenbelt Rd., Ste. 600
Lanham, MD 20706
301-867-2000

www.ssaihq.com

**VIRGINIA OFFICE**
1 Enterprise Pkwy., Ste. 200
Hampton, VA 23666
757-951-1600